**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Jonathan M. Scott (SBN 323322)
JonathanS@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiff Melissa Hanna*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA HANNA, derivatively on behalf of MOMENTUS INC. (F/K/A STABLE ROAD ACQUISITION CORP.), a Delaware corporation, | Case No.: 5:23-cv-00374 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| BRIAN KABOT, JUAN MANUEL QUIROGA, JAMES NORRIS, JAMES HOFMOCKEL, MIKHAIL KOKORICH, DAWN HARMS, FRED KENNEDY, CHRIS HADFIELD, MITCHEL B. KUGLER, VICTORINO MERCADO, KIMBERLY A. REED, LINDA J. REINERS, JOHN C. ROOD, STABLE ROAD ACQUISITION CORP., AND SRC-NI HOLDINGS, LLC, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| -and- | |
| MOMENTUS, INC. (F/K/A STABLE ROAD ACQUISITION CORP.), a Delaware corporation, | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF THE ACTION ................................................1

II.   JURISDICTION AND VENUE ..................................................................4

III.  THE PARTIES.......................................................................................5

    A.   Plaintiff.......................................................................................5

    B.   Nominal Defendant Momentus ..................................................5

    C.   Individual Defendants ...............................................................5

    D.   Entity Defendants .....................................................................7

IV.   FACTUAL BACKGROUND ....................................................................7

    A.   Background Of Momentus ..........................................................7

    B.   Kokorich As A National Security Concern..................................8

    C.   Momentus's Unproven Technology..........................................10

    D.   Momentus's Unproven Projections..........................................10

    E.   The Failed Due Diligence ........................................................11

V.    SUBSTANTIVE ALLEGATIONS..........................................................11

    A.   Material Misrepresentations And Omissions ...........................12

    B.   Reasons The Individual Defendants' Statements Were Improper ........17

    C.   The Truth Emerges..................................................................18

    D.   The Securities Class Action Motion To Dismiss Ruling.......................23

VI.   DUTIES OF THE INDIVIDUAL DEFENDANTS TO MOMENTUS ............26

    A.   The Individual Defendants' Fiduciary Duties.........................26

    B.   Corporate Governance Guidelines ..........................................29

    C.   Audit Committee Charter........................................................29

VII.  BREACHES OF DUTIES AND HARM TO THE COMPANY......................32

VIII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ......................................................34

IX.   DAMAGES TO MOMENTUS................................................................35

X.    DERIVATIVE AND DEMAND ALLEGATIONS.........................................36

i

A.    Plaintiff's Demand Allegations.................................................37

B.    The Board's Investigation Was Unreasonable
Under Delaware Law And Its Refusal Of The
Demand Was Not A Valid Exercise Of Business Judgment.................39

XI.    CLAIMS FOR RELIEF ...................................................................42

XII.    PRAYER FOR RELIEF.....................................................................49

XIII.    DEMAND FOR JURY TRIAL..........................................................51

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Melissa Hanna ("Plaintiff"), by her undersigned counsel, brings this shareholder derivative action on behalf of Nominal Defendant Momentus, Inc. ("Momentus" or the "Company") against certain current and former officers and directors of the Company for violations of law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, indemnification, and for contribution for violations of the federal securities laws. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of public filings made by Momentus and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by the Company, certain of the defendants and other related non-parties; (iii) review of news articles, shareholder communications, and postings on Momentus's website concerning the Company's public statements; (iv) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action captioned *In re Stable Road Acquisition Corp. Securities Litigation,* Case No. 2:21-cv-05744 (C.D. Cal.) (the "Securities Class Action"), and the SEC action captioned *SEC v. Kokorich*, Case No. 1:21-cv-01869 (D.D.C.) (the "SEC Action"); and (v) review of other publicly available information concerning Momentus, the Individual Defendants (defined below), and the Wrongful Refusal Defendants (defined below).

I. <u>**NATURE AND SUMMARY OF THE ACTION**</u>

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Nominal Defendant Momentus against certain of its officers and directors for breaches of fiduciary duties and other violations of law from October 7, 2020 to the present (the "Relevant Period"). These wrongs resulted in hundreds of millions of dollars in damages to Momentus's goodwill and business reputation.

2.     Momentus purports to be a "space infrastructure company" that offers "in-space transportation as [its] core service." The Company claims that it "intends to use a multi-pronged approach to become a provider of three critical functions in the new space economy: Space

1

Transportation, Satellite as a Service, and In-Orbit Servicing."  To achieve these services, Momentus is purportedly developing "transfer and service vehicles that will carry satellites and hosted payloads between orbits in space."

3.   Momentus came to exist in its current form through a merger (the "Merger") it conducted with Stable Road Acquisition Company ("SRAC"), a special purpose acquisition company ("SPAC").

4.   Prior to the Merger, SRAC's **stated purpose was to find and acquire a cannabis company**.  If SRAC was unable to locate such a company prior to its May 13, 2021 deadline, it would be obligated to repay $172.5 million to shareholders.  As this deadline approached and without SRAC having located a cannabis company, it desperately set its sights on Momentus, a pre-revenue company **that operated in the aerospace industry**, which no individual employed by SRAC had any experience in.

5.   The SRAC Defendants (defined below) caused it to target Momentus at the last moment **because they would stand to receive tens of millions of dollars from the Merger**.  Thus, in order to ensure shareholder approval for the Merger, the SRAC Defendants caused it to conduct minimal and insufficient due diligence and to misleadingly promote Momentus's prospects.

6.   On July 13, 2021, the SEC released a cease-and-desist order against Momentus, SRAC, SRCNI Holdings LLC (the "Sponsor") and SRAC's Chief Executive Officer ("CEO"), Brian Kabot and a civil complaint filed against Defendant Kokorich.  The SEC order and complaint, detailed how the SRAC Defendants misleadingly touted the proposed merger and Momentus's prospects while failing to disclose that SRAC's officers and directors failed to disclose to investors that: (i) the federal government had determined Momentus's CEO, Mikhail Kokorich, **to be a threat to national security**; (ii) Momentus had **never** successfully tested its technology in space; (iii) as a result, the Company's projections of Momentus's future revenues were **grossly overstated**; and (iv) the Company's due diligence of Momentus was inadequate. Moreover, **the SEC order and complaint provided that together, Momentus, SRAC, and Kabot had agreed to pay the SEC fines totaling over $8 million** and that the Sponsor agreed to give

up its SRAC stock.

7.     Indeed, on July 13, 2021, the SEC issued a press release announcing the SEC Order and the SEC Complaint.  The press release quoted SEC Chair, Gary Gensler, stating that *the defendants "misled the investing public" and that SRAC had "fail[ed] to undertake adequate due diligence to protect shareholders."*  Gensler further stated, in relevant part:

> This case illustrates risks inherent to SPAC transactions, as those who stand to earn significant profits from a SPAC merger may conduct inadequate due diligence and mislead investors . . . Stable Road, a SPAC, and its merger target, Momentus, both misled the investing public. The fact that Momentus lied to Stable Road does not absolve Stable Road of its failure to undertake adequate due diligence to protect shareholders. Today's actions will prevent the wrongdoers from benefitting at the expense of investors and help to better align the incentives of parties to a SPAC transaction with those of investors relying on truthful information to make investment decisions.

8.     As a result of these false and misleading statements and omissions, Momentus suffered significant damages, including, without limitation, the costs and expenses of the Securities Class Action and the SEC Action, (the latter resulting in a settlement requiring Momentus to pay $7 million), the costs and expenses of compensation to derelict directors and officers in breach of their fiduciary duties, and a loss of credibility and market capitalization.

9.     On August 16, 2022, Plaintiff issued a written demand (the "Demand") on Momentus's board of directors (the "Board") to investigate and take the necessary legal action against those responsible for the damages the Company has sustained as a result of the wrongdoing detailed herein.  Notwithstanding that over three months have passed since Plaintiff issued the Demand—and in total and patent contravention of Delaware law and the directors' fiduciary duties—*the Board unreasonably and wrongfully ignored the Demand*.  The Board has failed to act independently, in good faith, and within the realm of sound business judgment in so doing.

10.     In response to the Board's unreasonable and wrongful failure to respond to Plaintiff's Demand and disinterestedly and independently investigate and remediate harms caused to the Company, Plaintiff has filed this action alleging breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution for violations of federal securities law.  Because the Board's failure to respond to the Demand was improper and directly at odds

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   with the Board's fiduciary duties, as detailed further herein, this derivative action should be

2   permitted to proceed for the benefit of the Company and its shareholders.

3   **II.      JURISDICTION AND VENUE**

4           11.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this action states

5   a federal question.  Plaintiff has asserted a federal claim for contribution derivatively on behalf

6   of the Company, arising under Sections 10(b) and 21D of the Securities Exchange Act of 1934

7   (the "Exchange Act"), 15 U.S.C. § 78u-4.  Pursuant to federal statutory law, this Court has

8   original federal question jurisdiction over the federal contribution claim.

9           12.      This Court has supplemental jurisdiction over the remaining claims under 28

10   U.S.C. § 1367.

11          13.      This action is not a collusive action designed to confer jurisdiction on a court of

12   the United States that it would not otherwise have.

13          14.      This Court has personal jurisdiction over each defendant because each defendant

14   is either a corporation conducting business and maintaining operations in this District or is an

15   individual who is either present in this District for jurisdictional purposes or has, directly and

16   indirectly, used the means and instrumentalities of interstate commerce, including, but not

17   limited to, the United States mails, interstate telephone communications, and the facilities of the

18   national securities exchanges and markets, such that each defendant has sufficient minimum

19   contacts with this District so as to render the exercise of jurisdiction by this Court permissible

20   under traditional notions of fair play and substantial justice.

21          15.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

22   U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d).  Momentus maintains its headquarters in

23   San Jose, California, which is situated in this District, conducts substantial business in this

24   District, and many of the acts and conduct that constitute the violations of law complained of

25   herein, including dissemination to the public of materially false and misleading information,

26   occurred in and/or were issued from this District.  In connection with the acts alleged in this

27   Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate

28   commerce, including, but not limited to, the mails, interstate telephone communications, and the

4

1  facilities of the national securities markets.

2  III.    **THE PARTIES**

3      A.    **Plaintiff**

4      16.    Plaintiff Melissa Hanna is a current shareholder of Momentus and has

5  continuously held Momentus common stock since at least October 1, 2020.  Plaintiff is a citizen

6  of the state of New Jersey.

7      B.    **Nominal Defendant Momentus**

8      17.    Nominal Defendant Momentus is incorporated under the laws of Delaware with

9  its principal executive offices located at 3901 North First Street, San Jose, California 95134.

10  Momentus's common stock trades on the NASDAQ Global Select Market under the symbol

11  "MNTS."  As of November 4, 2022, the number of shares of Momentus's common stock

12  outstanding was 84.1 million.

13      C.    **Individual Defendants**

14      18.    John C. Rood ("Rood") has served as the Company's CEO and Chairman of its

15  Board since August 2021.  Rood is a member of the Board's Disclosure Committee.  In 2021,

16  Rood received a total of $11,204,806 in compensation from the Company.

17      19.    Brian Kabot ("Kabot") served as the CEO and Chairman of the board of directors

18  of SRAC.  Kabot was also a manager of SRAC's sponsor, the Sponsor, and had voting and

19  control over the Sponsor's securities.  Kabot also beneficially owned securities owned by the

20  Sponsor.  Kabot is also a director on the Board of Momentus and is the Chairperson of its

21  Compensation Committee.  Kabot is named as a defendant in the Securities Class Action.

22      20.    Chris Hadfield ("Hadfield") serves as a director on Momentus's Board.  Hadfield

23  is a member of the Board's Compensation Committee, Disclosure Committee, and Nominating

24  and Corporate Governance Committee.

25      21.    Mitchel B. Kugler ("Kugler") serves as a director on Momentus's Board.  Kugler

26  is the Chairperson of the Board's Disclosure Committee and is a member of its Compensation

27  Committee and its Audit Committee.

28      22.    Victorino Mercado ("Mercado") serves as a director on Momentus's Board.

Mercado is the Chairperson of the Board's Nominating and Corporate Governance Committee and is a member of its Security Committee.

23.     <u>Kimberly A. Reed ("Reed")</u> serves as a director on Momentus's Board.  Reed is a member of the Board's Audit Committee and its Nominating and Corporate Governance Committee.

24.     <u>Linda J. Reiners ("Reiners")</u> serves as a director on Momentus's Board.  Reiners is the Chairperson of the Board's Audit Committee.

25.     <u>Mikhail Kokorich ("Kokorich")</u> served as CEO and a director of Momentus until his resignation effective on or about January 25, 2021.  Kokorich was a major shareholder of the Company until he sold his shares to Momentus on or about June 8, 2021.  Kokorich is named as a defendant in the Securities Class Action.

26.     <u>Dawn Harms ("Harms")</u> has served as Chief Revenue Officer of Momentus since November 2019.  When Kokorich's resignation effective on or about January 25, 2021, Harms briefly assumed the role as interim CEO and director of Momentus until August 2021.  Harms is named as a defendant in the Securities Class Action.

27.     <u>Fred Kennedy ("Kennedy")</u> previously served as President of Momentus until his resignation in January 2022.  Prior to this, Kennedy was President of SRAC.  Kennedy is named as a defendant in the Securities Class Action.

28.     <u>Juan Manuel Quiroga ("Quiroga")</u> served as SRAC's Chief Investment Officer and Secretary.  Quiroga was a manager of the Sponsor, had voting control over the Sponsor's securities, and beneficially owned securities owned by the Sponsor.  Quiroga is named as a defendant in the Securities Class Action.

29.     <u>James Norris ("Norris")</u> served as Chief Financial Officer ("CFO") and a director of SRAC.  Norris was a member of the Sponsor.  Norris is named as a defendant in the Securities Class Action.

30.     <u>James Hofmockel ("Hofmockel")</u> served as a director of SRAC.  Hofmockel was also a member of the Sponsor.  Hofmockel is named as a defendant in the Securities Class Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**D.    Entity Defendants**

31.    Stable Road Acquisition Corp. ("SRAC") was a SPAC, which was incorporated in Delaware.  SRAC maintained its principal executive offices at 1345 Abbot Kinney Blvd. Venice, California 90291 during the Relevant Period.  During the Relevant Period, SRAC's Class A common stock, warrants and units traded on the Nasdaq Capital Market under the symbols "SRAC," "SRACW" and "SRACU," respectively.

32.    SRC-NI Holdings, LLC (the "Sponsor") was SRAC's sponsor during the Relevant Period.  The Sponsor was a Delaware limited liability company.  During the Relevant Period, the Sponsor's principal place of business was 1345 Abbot Kinney Blvd., Venice, California 90291.

33.    Defendants identified in ¶¶18-24 are referred to herein as the "Director Defendants" and "Wrongful Refusal Defendants."  Defendants Kokorich, Harms, and Kennedy identified in ¶¶25-27 are referred to herein as the "Momentus Individual Defendants." Defendants Kabot, Quiroga, Norris, and Hofmockel identified in ¶¶19, 28-30 above are referred to herein as the "SRAC Individual Defendants."  Defendants identified in ¶¶19, 25-32 above are referred to herein as the "Securities Class Action Defendants."  Defendants identified in ¶¶18-30 above are referred to herein as the "Individual Defendants."  Defendants identified in ¶¶31-32 above are referred to herein as the "Entity Defendants."

**IV.    FACTUAL BACKGROUND**

**A.    Background Of Momentus**

34.    SRAC was a SPAC incorporated on May 28, 2019, in the state of Delaware with its headquarters located in Venice Beach, California.  The Company completed its initial public offering ("IPO") on November 13, 2019, which generated gross proceeds of $172.5 million and started the clock for SRAC's directors and officers to effectuate a merger with one or more previously unidentified businesses over the next 18 months.  A failure to effectuate an acquisition or similar business combination would require dissolution of the SPAC, with proceeds from the IPO being returned to the investors and no compensation going to the founders and managers of the SPAC.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

35.     Compared to traditional IPO transactions where banks underwrite the offering and perform due diligence, in SPAC transactions there are no underwriters.  This means the SPAC and its controlling persons, like SRAC's directors and officers here, are in charge of the due diligence and requisite disclosures that accompany any resulting business combination.

36.     It is typical that common stockholders of SPAC are granted voting rights to approve any potential business combinations.  Once a target company has been identified, a merger proxy statement is to be sent to all stockholders of the SPAC which includes all the target company's financial statements and terms of the proposed combination.  Thus, public shareholders in SRAC relied on the officers and directors of the SRAC and Momentus to honestly provide accurate information about the Merger.

37.     During the IPO and afterwards, the Company's directors and officers held themselves out to the public as highly experienced businesspeople in the cannabis industry, which they repeatedly stated would be SRAC's focus for completing an acquisition.  The Company's IPO prospectus did not disclose, for any of its officers or directors, any experience with satellites, the space industry, engineering, national security regulations, or any other related matters.

38.     As the 18-month merger deadline approached, the directors and officers risked divestiture of the roughly $172.5 million in proceeds from the IPO, as well as a massive payout they would receive from any subsequent business combination.  Then, on October 7, 2020, SRAC and Momentus announced they had entered into a merger agreement in which SRAC stockholders would gain a proportionate interest in Momentus, and Momentus would gain access to the $172.5 million in IPO revenue, turning Momentus into a public company.

**B.     Kokorich As A National Security Concern**

39.     On July 13, 2021, the SEC published the SEC Order, filed its public complaint, and issued a related press release.  The SEC Order and SEC Action complaint (together, the "SEC Materials") ***revealed material facts not previously disclosed to investors***.  For example, Kokorich's national security risks, the true state of Momentus's unproven technology, and the Company's deficient due diligence.  The SEC Materials also revealed that ***Momentus had never***

*produced any revenue and had a history of increasingly large losses year over year*, thus giving Momentus's directors and officers a strong incentive to conceal any issues that might prevent the company from completing the Merger and gaining access to the badly needed cash.

40.     The SEC Materials shed further light on Kokorich's previous involvement with the U.S. Department of Treasury's Committee on Foreign Investment in the United States ("CFIUS"), the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), and Kokorich's pending immigration status.  The SEC Materials revealed that on March 22, 2018, the BIS sent an Export License Rejection Notice to Momentus, which denied the Company's application to provide Kokorich with the "[t]echnology required for the use of electrothermal propulsion devices and thrusters," *i.e.*, the propulsion technology that formed the core of all of Momentus's planned services, and which Momentus advertised as its main competitive advantage."  The rejection notice stated that the Department of Commerce had concluded that Kokorich "is not an acceptable recipient at this time of U.S.-origin items controlled for national security reasons."

41.     Then, in September 2018 Kokorich applied for asylum, claiming to be a prominent critic of the Russian government.  On or about August 28, 2019, USCIS informed Kokorich that it had not granted his asylum application, and that it had referred his case to an immigration judge for adjudication in removal proceedings.  USCIS based its determination on "inconsistencies" in Kokorich's application and testimony "with regard to [his] political affiliations and activities in Russia."  On or about the same date, the FBI, the Department of Homeland Security, and the BIS's Office of Export Enforcement arrived unannounced at Momentus's headquarters, questioned multiple employees, and detained Kokorich and transported him to an immigration detention center after which he was released on bond. Kokorich was in the process of adjudicating the removal proceedings when he left the U.S. in January 2021.

42.     Additionally, on November 12, 2020, Momentus received a notification from the Office of National Security and Technology Transfer Controls within the BIS, informing Momentus that the U.S. Department of Commerce intended to deny Momentus' application for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the deemed export of its "Vigoride" software and technology to Defendant Kokorich.  The notification stated that the Department of Commerce believed the denial "furthers the United States policy . . . to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States."  The notification further stated that the Department of Commerce made its determination in consultation with the Department of Defense, the Department of State, and the Department of Energy.

### C.   Momentus's Unproven Technology

43.    The SEC Materials also disclosed that Momentus had only conducted one test of its technology in space in its El Camino Real mission, that this test was not completed due to an equipment failure, and that even if this test had been successfully ***completed it would not have demonstrated the commercial viability of Momentus's technology***.  A former Momentus officer stated that the thruster tested in the El Camino Real mission did not have "commercial potential" because it was "too small, too inefficient, too low in [specific impulse], too low in total impulse." A former Momentus officer stated that the mission yielded "no data to suggest that that thruster would deliver an impulse of any commercial significance."  A Momentus engineer admitted that the mission did not yield sufficient data to demonstrate the propulsion system's reliability or longevity.  The SEC Materials also revealed that while the satellite used in the El Camino Real test is still in space, it is not functional.   Moreover, Kokorich, Harms, Momentus's Chief Engineer, and several other employees corresponded in an email chain with the subject line: "Need El Camino Real Failure Review Board."  That email chain discussed the failed propulsion test with the Company's Chief Technology Officer writing, "[e]ven if we recover the spacecraft, at this point it is my judgement that we need to convene a failure review board."  Also, the SEC Materials disclosed that a Momentus engineer sent Kokorich an email in February 2020 stating that Momentus did not obtain "any useful mission results" from the test.

### D.   Momentus's Unproven Projections

44.    Because Momentus would only recognize revenue upon successfully providing its planned services in space, its revenue forecasts were premised on the key assumptions that

Momentus's technology would work as hoped in space, and that Momentus would be granted all of the many required regulatory approvals to conduct its operations and place its products on rocket launches.  As such, the near-term revenue forecasts likewise depended on the critical assumption that Momentus would be allowed to participate in one rocket launch in 2020, and three more in 2021.  However, the national security concerns surrounding Kokorich and the unproven state of Momentus's key technology *posed significant risks that the Company would not receive the necessary regulatory approvals* and even if it did, *its technology would not perform as hoped*.  As the SEC Materials detail, at the very least, "Kokorich knew that in 2018 he had to divest his interest in his prior space technology company because CFIUS determined he posed a threat to national security.  He also knew that Momentus's 2020 application for an export control license for him would be denied for national security reasons."

### E.    The Failed Due Diligence

45.    Under pressure to complete a Merger prior to the deadline, SRAC's directors and officers caused the Company to rush the review being conducted by Stellar Solutions.  Indeed, the SEC Materials revealed that *SRAC did not specifically ask Stellar Solutions to review Momentus's disappointing El Camino Real mission*, and that the final report by Stellar Solutions made no mention of the mission.  Moreover, the SEC Materials reveal that SRAC's directors and officers *conducted inadequate due diligence relating to the national security concerns with Kokorich*.  For example, Kabot knew that CFIUS had required Kokorich to divest from another space technology company in 2018, having received a copy of CFIUS's final order.  However, the SEC Order states that SRAC's officers and directors failed to obtain a full and complete understanding of the CFIUS order and its impact on Momentus's business.

### V.    SUBSTANTIVE ALLEGATIONS

46.    To induce shareholders to approve the last-minute deal with Momentus and gain access to the IPO revenue, certain of the Individual Defendants caused the Company to publicly release and file with the SEC positive operational news and financial forecasts from October 7, 2020, through July 13, 2021.  Then, in a sudden reversal, the Company publicized highly unfavorable news regarding the Company's operations and financial forecasts to shareholders

1    after the SEC Action and numerous governmental investigations regarding Momentus's former

2    CEO were initiated.

3          **A.    Material Misrepresentations And Omissions**

4          47.    Defendants breached their fiduciary duties of care and loyalty by causing the

5    Company to issue materially false and misleading statements in its SEC filings.  Moreover, the

6    directors breached their fiduciary duties by failing to adhere to the Company's Corporate

7    Governance Guidelines and committee charters, resulting in harm to the Company.  Defendants'

8    breaches further damaged Momentus by exposing the Company to liability in the SEC Action

9    and the Securities Class Action, including significant defense costs and damages.  These

10   breaches of fiduciary duty are not insulated from liability under the business judgment rule.

11   Finally, while the directors may attempt exculpation from breach of fiduciary duties in the

12   governing documents, the officers are not exculpated.

13         48.    On October 7, 2020, the Company's directors and officers caused the Company

14   to file a Form 8-K with the SEC that contained information about the Merger, including a copy

15   of the joint press release, a copy of the merger agreement, and an investor presentation about

16   Momentus and the proposed Merger.  Moreover, the Company's officers and directors caused

17   the Company to hold a public conference call with investors, and CEO Kabot conducted a

18   televised interview on CNBC to further tout Momentus's prospects (collectively, the "October

19   7 Statements").

20         49.    Nowhere in the October 7 Statements do the Company's directors and officers

21   mention the national security concerns surrounding Kokorich—Momentus's co-founder, major

22   shareholder, and CEO.  Rather, in the phone call with investors, Kabot stated that "[w]ith its

23   visionary founder, highly experienced management team, progress to date and significant

24   commercial traction, Momentus is set to revolutionize and enable the future of the space

25   economy."

26         50.    In a press release announcing the Merger with SRAC, the Company's directors

27   and officers caused the companies to state that, "[i]n 2019, the Company successfully tested its

28   water plasma propulsion technology in space."

51.     Furthermore, the Company's directors and officers forecasted potential revenues for Momentus at $2 million in 2020, $19 million in 2021, increasing to over $1 billion by 2024, and over $4 billion by 2027, even though Momentus had failed to earn any revenue up to that point.  A slide in the investor presentation stated that "No additional capital needs expected prior to achieving profitability."  The script from the conference call with investors quotes Kokorich as stating that:

> Commercially, we have seen strong market traction. Our customers include defense primes such as Lockheed Martin, government agencies such as NASA, and dozens of small satellite manufacturers and operators. Our backlog encompasses the initial and early deployment of our customers' constellations, and we expect our backlog with existing customers will grow by many multiples as we plan to serve the rollout of our customers' constellations. We have several substantial opportunities currently in negotiation or in discussions, worth more than $1 billion of additional potential revenue.
>
> We expect good margin expansion over the next few years and we are projecting that we will be profitable by 2023 and operating at or near run-rate margins by 2025. On a run rate basis, we expect gross margins of around 70%, and EBITDA margins of 60%.

52.     In Kabot's interview on CNBC, when asked "whether you think there's just too many" SPACs, he answered, in relevant part:

> What I think is great for the investor is we did four months of due diligence. We spent a lot of money with some of the top service providers out there from Stellar Solutions to Kirkland and Ellis, from Orrick to Evercore to cantor completing our underwriting, right, we did four months of due diligence, which in a traditional IPO you would never have the opportunity to do, so I think SPACs are very healthy for the market.

53.     Moreover, during the CNBC interview, Kabot stated the following regarding the timing of Momentus's launch schedule:

> Our first commercial launch will be in December 2020 with SpaceX. We have a pretty full vehicle of satellites to deliver. And then we have a phenomenal launch cadence for 2021 going up with SpaceX in February, June, and December 2021. We actually have one and a half vehicles already booked for December 2021. So pretty aggressive launch cadence with SpaceX.

54.     The Company's officers and directors reiterated the foregoing false and misleading statements in subsequent statements and filings with the SEC.  For example, on November 2, 2020, the Company's officers and directors caused the Company to file a Registration Statement on Form S-4 with the SEC (the "Registration Statement").  The

13

Registration Statement was signed by Kabot, Norris, and Hofmockel.  Though the Registration Statement recited potential risks that could stem from the Merger, the directors and officers characterized Momentus as a valuable business with a clear path to rapid and substantial revenue growth and profitability.

55.     For example, Momentus's directors and officers caused the Company to state in the Registration Statement that "[w]e believe Mikhail Kokorich will play a vital role in helping us achieve our goals and advance the interests of our stockholders," and that "[w]e believe that Mr. Kokorich is qualified to serve as a member of the board of directors of the Combined Company because of his extensive professional experience in the space technology industry and deep knowledge of the operations of Momentus as our Chief Executive Officer."  The Registration Statement also downplayed Kokorich's previous involvement with the CFIUS, the BIS, and Kokorich's pending immigration status.

56.     Specifically, regarding Kokorich's involvement with CFIUS, the November 2020 Registration Statement stated that "it is possible that Mr. Kokorich's controlling interests in the Company, or perceptions surrounding Mr. Khasis and his affiliation with Sberbank, could make it more difficult to obtain CFIUS approval in connection with future potential investments by the Company in U.S. businesses."  In addition, the Registration Statement stated:

> With respect to any investment by Momentus that is within CFIUS's jurisdiction . . . CFIUS could block the consummation of an acquisition or investment within its jurisdiction or could order divestiture after the transaction is completed. Recently, a number of stockholders of a U.S. company, including Mr. Kokorich, divested their interests in such company pursuant to an order by CFIUS.

57.     Discussing Momentus's BIS application for a license to export its technology to Kokorich, the Registration Statement stated:

> We have been pursuing a BIS license since early 2018 to authorize the deemed export of the Company's controlled technology to Mr. Kokorich, but we have not yet been able to obtain such a license, and there is no assurance we will ever be able to obtain such a license in the future. If we continue to operate without such a license, Mr. Kokorich will continue to be unable to access this controlled technology for as long as he remains a non-US person. While we believe that if the current restrictions on Mr. Kokorich's access to controlled technology remain in place, we will be able to continue to operate our business without any material adverse impact on us, it is possible that these restrictions could in the future lead to complications or other issues that may have a material adverse impact on our operations.

58.     Concerning Kokorich's immigration status, the Registration Statement stated:

Momentus' co-founder and Chief Executive Officer, Mikhail Kokorich, who will be the Chief Executive Officer of the Combined Company, is a citizen of the Russian Federation who is seeking asylum in the United States and is authorized to work in the United States while his asylum application is pending. While Momentus believes Mr. Kokorich's application will be granted, if for any reason it is not, he may not be able to remain in the United States, which could make it difficult for him to perform his duties as Chief Executive Officer and as a director of the Company and the Combined Company, which would adversely impact us.

59.     Further, the Registration Statement made claims regarding the timing of Momentus's planned vehicle launches, stating "[w]e plan to launch the first iteration of our pioneer transport vehicle, Vigoride, in December 2020, followed by five vehicles in 2021.  All of our flights, beginning in December 2020, will have paying customers onboard," and that "Vigoride's first commercial mission is planned to launch in December 2020, followed by launches in April 2021, June 2021, and December 2021."

60.     The Registration Statement also contained financial projections that were known by the Company's officers and directors to be inaccurate.  Specifically, it stated that "The Combined Company will have an anticipated initial enterprise value of $1.2 billion, implying a 1.0x multiple of 2025 projected EBITDA as Momentus' operations are expected to achieve scale."

61.     In addition, the Registration Statement stated that:

We have received significant interest from a wide range of different customers across different satellite applications. Our current signed backlog (as of November 1, 2020) is worth approximately $90 million in potential revenue and continues to increase, while our pipeline consists of approximately $1.1 billion in potential contracts in negotiation or early conversations.

62.     The Company's directors and officers also caused the Company to report on its due diligence regarding Momentus, stating, in relevant part:

During the period between the execution of the Confidentiality Agreement and the execution of the Merger Agreement on October 7, 2020, Stable Road and its advisors conducted extensive due diligence with respect to Momentus' financial model, customer base and customer contracts, total addressable market, industry in which Momentus operates, companies comparable to Momentus and aero-defense companies with similar characteristics, technology solutions, intellectual property and relationship with SpaceX. Momentus provided representatives of Stable Road and its advisors with, among other materials in connection with Stable Road diligence review, confidential presentations

15

reflecting an overview of Momentus' business, as well as financial forecasts and written responses to detailed business and financial due diligence questions.

63. The Company's officers and directors caused the Company to file updated investor presentations with the SEC on October 13, 2020; November 17, 2020; December 14, 2020; April 7, 2020; and May 5, 2020. These subsequent filings reiterated the aforementioned positions regarding Momentus's business operations and prospects. The directors and officers further caused the Company to issue a dozen promotional press releases touting the Merger. One press release announced customer "contracts" to deliver satellites to lunar orbits, which Momentus had never attempted.

64. The Company's directors and officers also continued to appear in interviews to promote the Merger with SRAC. For example, on January 4, 2021, in an interview with IPO Edge, Kennedy reaffirmed Momentus's revenue projections and downplayed national security concerns related to Kokorich. Specifically, when asked about the launch delays during the interview, Kennedy stated:

> The most recent shift (from January 2021 to a subsequent launch in 2021) came about as result of a delay in the Federal Aviation Administration's (FAA's) approval of Momentus' spacecraft. The FAA did not express any specific concerns of its own, but rather indicated that more time was needed to complete its interagency review of Momentus' payload.

65. When the interviewer asked Kennedy "What is the nature of this interagency review, and is this the first time you are undergoing such a review?", he responded by stating:

> We are quite familiar with interagency review processes, and we have cleared similar reviews for our other licenses. For example, we recently cleared an interagency review as part of our effort to obtain a license from the National Oceanic and Atmospheric Administration (NOAA) to allow the operation of our spacecraft's camera. While we discuss interagency reviews in our S-4, these reviews are a standard part of various license application processes, allowing multiple government agencies – the Department of Commerce, Department of Defense, Department of State, NASA, and others – to examine the applications from their individual perspectives.

66. The interviewer also asked Kennedy "You state in your S-4 that interagency review may include a review of foreign ownership. Is that a concern for Momentus?" Kennedy replied:

> NOAA and its partner agencies have already reviewed Momentus' foreign

16

ownership – this review was completed to the satisfaction of these agencies, as evidenced by NOAA's issuance of a license. Momentus is approximately 74% U.S.-owned today, and this U.S.- majority ownership is expected to increase to approximately 84% upon the company's merger with Stable Road. This merger is on target to close in the first quarter of 2021 (subject to approval of Stable Road's and Momentus' stockholders and other closing conditions, including a registration statement being declared effective by the SEC). We also mention in our S-4 that Mikhail Kokorich, the CEO of Momentus and one of the company's larger shareholders, is an asylum seeker from the Russian Federation, currently pursuing several paths to U.S. Person status. We believe that Mr. Kokorich meets all legal requirements to be granted such status in the United States, and that he will be offered U.S. citizenship, further increasing U.S. ownership of Momentus.

67.     Regarding the Company's launch schedule in connection to its revenue projection, the interviewer asked Kennedy, "How will the new launch date impact your 2021 revenue?", to which Defendant Kennedy replied, "The number of launches did not change. Rather than launching in January, we will launch this particular vehicle at our first opportunity, later this year.  Hence, we do not expect changes to our total revenue for 2021."

68.     Then, on May 4, 2021, Kabot and Harms gave another interview with IPO Edge in which they continued to tout Momentus's prospects and technology.

**B.     Reasons The Individual**
**Defendants' Statements Were Improper**

69.     At the time they were made, the foregoing statements were materially false and misleading for several reasons.

70.     The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

(a)     the federal government had determined Momentus's CEO, Mikhail Kokorich, to be a threat to national security;

(b)     Momentus had never successfully tested its technology in space;

(c)     as a result, the Company's projections of Momentus's future revenues were grossly overstated; and

(d)     the Company's due diligence of Momentus was superficial, ignored red flags that necessitated further investigation, and did not provide a reasonable basis for the Company's statements about Momentus and the

17

1          Merger.

2          71.     The foregoing improper statements were material to a reasonable investor

3   because the misstatements and omission forecasts would alter the total mix of information

4   available.  Momentus's core business is the development of its space vehicles and thus, if the

5   Company had successfully tested is vehicles and technology, its profit potential would

6   dramatically increase.  However, Momentus's misstatements and omissions hid the fact that the

7   Company's technology had never been tested successfully in space and therefore, its future

8   revenues were grossly misstated.  Moreover, Momentus conveniently failed to disclose the

9   serious national security concerns regarding its CEO, Kokorich.

10         **C.      The Truth Emerges**

11         72.     As a result of the Individual Defendants' false and misleading statements and

12  omissions, Momentus shares traded at artificially inflated prices during the Relevant Period.

13  Once the true facts regarding the Company's financial prospects and future business prospects

14  began to emerge, the Company's stock price fell dramatically, erasing hundreds of millions of

15  dollars in market capitalization.

16         73.     From January 4, 2021 to July 13, 2021, the truth began to emerge, which resulted

17  in: (i) the repeated postponement of planned space missions; (ii) Kokorich's resignation;

18  (iii) customers and suppliers abandoning Momentus; (iv) the SEC's announcement of a Cease-

19  and-Desist Order (the "SEC Order"); and (v) the filing of the SEC Action against Kokorich.  As

20  a result of these revelations and the emergence of the truth, the Company's share price dropped

21  significantly, causing harm to Momentus.

22         74.     On January 4, 2021, Momentus announced that it would be delaying a launch

23  planned for December 2020 or January 2021 that was to place customer satellites in space and

24  further test Momentus's technology in space.  This primarily resulted from the denial of a

25  requested approval by a federal agency without which Momentus could not conduct the launch.

26  The announcement stated that the requested approval was currently under "interagency review"

27  and that Momentus "will be remanifesting its January 2021 mission to a subsequent launch

28  opportunity in 2021.  This move will allow for the additional time necessary to secure FAA

18

approval of Momentus' payloads, including completion of a standard interagency review." This partial disclosure resulted in SRAC's stock price closing at $16.25 per share on January 5, 2021 – a 6% decline from the previous day. This decline continued on January 6, 2021 when the Company's stock price closed at $15.40 per share.

75.     Then, on January 25, 2021, the Company's directors and officers caused SRAC to file a copy of Momentus's press release announcing Kokorich's resignation with the SEC. It stated, in relevant part, that:

> Momentus, in consultation with . . . Stable Road . . . has determined that accepting Mr. Kokorich's resignation is in the best interest of the Company, in an effort to expedite the resolution of U.S. government national security and foreign ownership concerns surrounding the Company, the existence of which the Company recently has confirmed.

76.     In connection to Kokorich's resignation, on March 8, 2021, during stock market trading hours the Company's directors and officers caused the Company to file an amended Registration Statement with the SEC on Form S-4/A (the "March Amended Registration Statement"). It disclosed, in relevant part, that:

> On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense . . . stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination.

77.     Further, the March Amended Registration Statement stated the following regarding the FAA's license approval due to national security concerns. The March Amended Registration Statement stated:

> [A]fter a series of communications with the FAA with respect to a license for the January 2021 mission, the FAA ultimately determined that it was unable to grant to SpaceX an approval of the Momentus payload for the SpaceX Transporter-1 launch in January 2021 due to national security and foreign ownership concerns regarding Momentus raised by the Department of Defense during an interagency review.

78.     The March Amended Registration Statement also included how Momentus had to undertake costly and time consuming "mitigation" efforts to fully address the federal government's national security concerns surrounding Momentus. It went on to state that:

19

1

[I]n January 2021, the SEC's Division of Enforcement informed Stable Road
2   and Momentus that it was investigating certain disclosures made in filings with
    the SEC, including in connection with the Business Combination. Stable Road
3   and Momentus are fully cooperating with the SEC's investigation and are unable
    to predict the outcome of the matter at this time.

4      79.    On May 4, 2021, representatives of SRAC and Momentus were interviewed by

5   IPO Edge.  Included with the interview was a revised draft of Momentus's investor presentation.

6   The next day, on May 5, 2021, SRAC publicly filed a transcript of the interview and a draft of

7   the investor presentation with the SEC on Form 425.  Unlike its previously published investor

8   presentation filed by SRAC and Momentus, Defendants omitted all backlog numbers from this

9   filed version of the presentation.  In addition, this presentation did not reference Lockheed

10  Martin as being on the list of Momentus customers.  On May 4, 2021, following the interview

11  and presentation, SRAC's stock closed at $11.08 per share, 6.7% lower than its closing price the

12  previous day.

13     80.    On May 24, 2021, SRAC filed with the SEC a current report on Form 8-K, which

14  stated:

15     On May 23, 2021, Momentus informed Stable Road that it does not expect to fly
       any missions in 2021 and that this determination was based on information from
16     SpaceX that it was suspending its Momentus-related efforts while Momentus
       works to secure approvals from the U.S. government . . . Momentus is in the
17     process of updating its financial projections and backlog.

18     81.    On June 29, 2021, SRAC filed with the SEC an amended Registration Statement

19  (the "June Amended Registration Statement") on Form S-4/A.

20     82.    The June Amended Registration Statement contained partial corrective

21  disclosures relating to its unproven technology, disclosing that "the technology underlying

22  [Momentus's] anticipated service offerings (including its water plasma propulsion technology)

23  is still in the process of being developed and has not been fully tested or validated in space and

24  may never have the capabilities or functionality in space that Momentus currently expects."

25     83.    Further, the June Amended Registration Statement stated that Momentus's only

26  space test had failed:

27     Our first-generation X-band thruster, which operates at 30 Watts, was flown
       aboard a demonstration mission called El Camino Real in mid- 2019. During this
28     mission, Momentus launched its first MET into space as a hosted payload on a

nanosatellite. The mission's objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one-minute firings. The MET was instrumented with temperature, pressure and RF reflected power sensors to infer the presence of water plasma, which if detected, would indicate that the water propellant was flowing into the thrust chamber and radio frequency energy was being absorbed by the water.  Failure of the host satellite in November 2019 prematurely terminated the demonstration after only 23 of the planned 100 firings of the thruster had been performed including 12 hot firings with microwave power turned on and 11 cold firings with the microwave turned off. While a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma generation, the three hot firings that did have water present were found to have produced plasma.

84.     The June Amended Registration Statement also disclosed the federal government's national security concerns surrounding Defendant Kokorich, stating:

On June 8, 2021, CFIUS' review of the joint notice relating to historical acquisitions of interests in Momentus by Mr. Kokorich, his wife, and entities that they control concluded when the Company entered into a National Security Agreement with Mr. Kokorich, on behalf of himself and Nortrone Finance S.A. (an entity controlled by Mr. Kokorich), Lev Khasis and Olga Khasis, each in their respective individual capacities and on behalf of Brainyspace LLC (an entity controlled by Olga Khasis), and the U.S. government, represented by the U.S. Departments of Defense and the Treasury (the 'NSA').  In accordance with the NSA, on June 8, 2021, Mr. Kokorich, Nortrone Finance S.A., Lev Khasis and his wife Olga Khasis, and Brainyspace LLC fully divested all the equity interests in Momentus owned or beneficially owned by them by selling such equity interests to Momentus. The NSA also establishes various requirements and restrictions on Momentus in order to protect national security, certain of which may materially and adversely affect the operating results of Momentus due to uncertainty associated with and the cost of compliance with security measures, and limitations on Momentus' control over certain U.S. facilities, contracts, personnel, vendor selection and operations.

85.     Further, the June Amended Registration Statement disclosed that Momentus was going to pay $50 million to Defendant Kokorich, Lev Khasis, and their affiliates for the repurchase of their interests in the Company.  The June Amended Registration Statement disclosed also the expensive and elaborate requirements the Company was required to undertake in connection with its National Security Agreement with the U.S. government.  The June Amended Registration Statement stated:

Under the NSA, we are required to hire and pay for the costs of a full time Security Officer who will be responsible for overseeing compliance with the NSA, an independent third-party monitor to monitor compliance with the NSA by the parties to the NSA, as well as an independent third-party auditor to regularly audit our compliance with the NSA. We are also required to establish: (i) a security plan to safeguard protected technical information, systems and facilities; (ii) a board-level Security Committee to oversee the development and

21

implementation of policies and procedures to safeguard protected technical information, systems and facilities and to exercise appropriate oversight and monitoring of Momentus' operations to ensure that the protective measures contained in the NSA are effectively maintained and implemented; (iii) an audit plan; and (iv) a communications plan. We are also required to provide detailed and frequent reports to the third-party monitor. We will incur substantial costs to implement these and other requirements under the NSA, and we expect that substantial personnel time will need to be devoted to implement and comply with these requirements . . . These costs, requirements and restrictions may materially and adversely affect our operating results.

86.     Moreover, the June Amended Registration Statement revealed additional delays to Momentus's scheduled launch date:

Our first launch with customers is currently anticipated to occur in June 2022, subject to receipt of licenses and other government approvals and availability of slots on our launch provider's manifests. Prior planned launches were cancelled due to not receiving required licenses and other governmental approvals and other factors, and we can offer no assurances that our first launch will occur in June 2022.

*          *          *

Momentus now anticipates sending its first two Vigoride vehicles into space in June 2022 . . . approximately 18 months later than had been contemplated at the time of our initial merger announcement.

87.     Significantly, the June Amended Registration Statement disclosed that the Company had seen a decline in its customer base due to the national security concerns surrounding its CEO and launch delays:

If we do not receive [government] approvals in a timely manner, our financial condition, results of operations, backlog and prospects will be materially adversely affected. For example, we have experienced erosion in our backlog of $86 million as of March 4, 2021 to $66 million as of June 11, 2021 as customers chose to cancel their contracts with us and seek alternative providers due to delays in our scheduled missions as we await receipt of necessary governmental approvals.

88.     The June Amended Registration Statement also revealed that SRAC and Momentus had adjusted their merger agreement to reflect Momentus's value as being only half as valuable as what Defendants had previously publicly represented:

On June 29, 2021, SRAC, Momentus and the other parties to the Merger Agreement entered into an amendment to the Merger Agreement to, among other things, reduce the enterprise valuation of Momentus from $1.131 billion to $566.6 million due to regulatory delays which have resulted in delays in the closing of the Business Combination and Momentus' launch schedule.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

As a result of these delays, Momentus has updated its financial projections.

89.     The June Amended Registration Statement also disclosed significant revisions to Momentus's prior revenue projections, ***admitting that Momentus had zero revenue in 2020, projected no revenue for 2021, and projected only $5 million in revenue for 2022***, in addition to downward revisions in all future years.  Defendants stated, "[i]n general, projected revenue and gross profits have shifted forward by 18 months."  The June Amended Registration Statement claimed that the Company's revenue projections "are based on assumptions about Momentus' ability to fully develop, test and validate its technology in space, including its water plasma propulsion technology, and assumes that Momentus can obtain the necessary licenses and regulatory approvals from the U.S. government for its missions on a timely basis."

90.     Regarding the SEC investigation, the June Amended Registration Statement admitted the following:

> On January 24, 2021, the Company received a subpoena from the Division of Enforcement of the U.S. Securities and Exchange Commission . . . requesting documents regarding the Registration Statement . . . filed by SRAC in connection with the Business Combination. Most recently, the Company has entered into settlement discussions with the Division of Enforcement in an effort to resolve a potential enforcement action.

91.     Finally, on July 13, 2021 when the SEC Materials revealed material facts not previously disclosed to investors; specifically, Kokorich's national security risks, the true state of Momentus's unproven technology, and the Company's deficient due diligence.  Indeed, the SEC Materials revealed that ***Momentus had never produced any revenue and had a history of increasingly large losses year over year***, thus giving Momentus's directors and officers a strong incentive to conceal any issues that might prevent the Company from completing the Merger and gaining access to the badly needed cash.

### D.     The Securities Class Action Motion To Dismiss Ruling

92.     As alleged in the Securities Class Action and as further described above, the Securities Class Action Defendants appear to have violated the federal securities laws including §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a result of their misconduct, the Company now possesses valuable claims against these individuals for

breaching their fiduciary duties of care and loyalty (and the duty of disclosure derived therefrom), for aiding and abetting breaches of fiduciary duty through their scheme to mislead the Company's stockholders, as well as claims for unjust enrichment and corporate waste.

93.     Indeed, recently in the Securities Class Action, the Hon. John F. Walter of the U.S. District Court for the Central District of California largely denied the defendants' motion to dismiss finding that the complaint adequately alleges that certain of the defendants made false or misleading statements or omissions of material fact.[1]  Specifically, Judge Walter expressly held:

> [A]fter carefully reviewing the Momentus Defendants'[2] disclosures and statements, especially when viewed together with the information Plaintiff alleges that the Momentus Defendants knew and did not disclose, the Court cannot conclude as a matter of law that the alleged omissions or misstatements were not material or misleading. Risk disclosures that "speak[] entirely of as-yet-unrealized risks and contingencies" and do not "alert[ ] the reader that some of these risks may already have come to fruition" can mislead reasonable investors. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008). In Berson, the Ninth Circuit held that the company's statement of anticipated revenues from its large backlog of work was misleading because it failed to disclose that a significant portion of the "backlogged" work was "substantially delayed and at serious risk of being cancelled altogether." *Id.* at 986. Similarly, in *Siracusano v. Matrixx Initiatives, Inc.*, a 10-Q statement that warned of the risks of product liability claims in the abstract was misleading because it failed to disclose that the risk had already come to fruition. 585 F.3d 1167, 1181 (9th Cir. 2009). Similarly here, Plaintiff plausibly alleges that the Momentus Defendants' warnings of risks that might occur is misleading to a reasonable investor because the Momentus Defendants knew that many of those risks had already materialized or very likely would materialize. *In re Alphabet, Inc. Securities Litigation*, 1 F.4th at 703-04. *Cf. Macomb County Employees' Retirement System v. Align Technology, Inc.*, 2022 WL 2525306 at *5 (9th Cir. July 7, 2022) (affirming dismissal of 10(b) claims where defendant's statements did not affirmatively create an impression that materially differed from the facts that actually existed).
>
> Accordingly, the Court concludes that Plaintiff has adequately alleged that the Momentus Defendants made false or misleading statements or omissions of material fact.

94.     Moreover, Judge Walter further concluded that the Securities Class Action complaint adequately alleges scienter as to the Momentus Defendants, stating:

> In this case, Plaintiff's allegations, when considered collectively, give rise to a

---

[1] Securities Class Action ECF No. 154.

[2] The "Momentus Defendants" include Kokorich, Harms, and Kennedy

strong inference of scienter. The Court concludes that the factual allegations taken as a whole permit a strong inference that the individual defendants knew that their representations with respect to Momentus' prospective revenues were misleading due to the failure to disclose all material information regarding Momentus' inability to obtain regulatory approval because of Kokorich's national security issues and their knowledge that the only test of Momentus' core technology had failed. Moreover, the allegations satisfy the specificity requirements of Rule 9(b) and the PSLRA. The specific allegations of the roles each individual defendant played in the alleged fraud give rise to a strong inference of scienter on the part of each individual defendant.

Moreover, Plaintiff argues that a strong inference of scienter can be shown by the individual defendants' high-level positions within Momentus, and the facts alleged relating to their roles in the fraudulent activity. *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687, 706 (9th Cir. 2021). See, e.g., *In re Zoran Corp. Deriv. Litig.*, 2007 WL 1650948, at *20 (N.D.Cal. June 5, 2007) (pleading specific facts about each individual defendants' role in the options granting process, including statements from confidential witnesses). For example, Plaintiff alleges that Harms had direct knowledge that the El Camino Mission failed based on an internal email she received in 2019 and also as Momentus' Chief Revenue Officer (and later interim CEO) she had a direct role in matters relating to Momentus' revenue projections, including a due diligence call with Stable Road Corp. on September 25, 2020 and an interview with IPO Edge in May, 2021. Plaintiff further alleges that based on Harms' position as part of the leadership team, Harms should have known of Kokorich's national security and immigration issues. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong interference of scienter when made in conjunction with detailed and specific allegations").

The specific allegations against Kennedy combined with the inference of his knowledge based on his position as Momentus' President are also sufficient to allege scienter. Plaintiff alleges that Kennedy made material misstatements and omissions in an interview discussing revenue projections and downplaying Kokorich's national security issues and the adverse impact they had in the FAA's failure to approve Momentus' launch. Plaintiff argues that as President, and a key member of the Momentus management team, it would be "absurd" to assume that nobody at Momentus informed Kennedy of key operational details, such as the government's November 12, 2020 rejection of Momentus' application to provide its technology to Kokorich, especially given Kennedy's background and experience working in high level positions at the Defense Department, White House and Air Force. In response, Kennedy argues that there are no allegations that he had access to information that would have put him on notice that his statements were false or misleading. Plaintiff, however, specifically alleges that matters relating to Kokorich's national security issues and Momentus' regulatory approvals were an integral part of Momentus' core operations and that the Momentus Individual Defendants had strong financial motives to obtain those approvals and complete the merger with Stable Road Corp. Defendants' argument also ignores the specific and detailed information Kennedy disclosed in his interview regarding Kokorich's immigration status, the regulatory issues and significance of successfully completing the licensing process. It is implausible that Kennedy would only be aware of the facts he disclosed in his interview and none of the other directly relevant and material

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

information that would have made his statements not misleading. The Court declines to make this assumption on a Motion to Dismiss, and concludes that Plaintiff has sufficiently alleged that Kennedy had the requisite scienter.

The Momentus Defendants also argue that Plaintiff fails to allege scienter with respect to Kokorich. The Court disagrees. Plaintiff's allegations regarding Kokorich are more than sufficient. The Court thus concludes that considering the allegations in the Complaint in a holistic and collective manner, Plaintiff has adequately alleged that the Individual Momentus Defendants had the requisite knowledge both due to their positions and Plaintiff's specific allegations.

95.   Finally, Judge Walter found that the complaint adequately alleged scienter against Stable Road Corp. and Kabot, stating:

The Court has reviewed the complaint and all of the allegations against Stable Road Corp. The Court agrees with the Plaintiff and concludes that considered holistically and in its entirety, the pleaded facts give rise to a "strong" inference of scienter–based deliberate recklessness or willful blindness--that is at least as strong as any opposing inference. *See Tellabs*, 551 U.S. at 324.

With respect to the individual defendants, the Court concludes the allegations are sufficient to plead a strong inference of scienter as to Kabot, who was allegedly responsible for making statements regarding Kokorich and Momentus' technology while at the same time failing to further investigate Kokorich's national security issues, and the absence of information regarding Momentus' only test of its technology, and also for touting Stable Road Corps.' extensive due diligence. Accordingly, the Court concludes that Plaintiff's allegations that Kabot made statements and representations with deliberate recklessness and willful blindness are sufficient to establish a strong inference of scienter. Accordingly, defendants Stable Road Corp. and Kabot's Motion to Dismiss count one is denied[.]

96.   The decision by Judge Walter to deny the Securities Class Action Defendants' motion to dismiss, at least in part, further supports the wrongdoing alleged herein and provides additional basis for allowing Plaintiff's claims to proceed.

## VI.   DUTIES OF THE INDIVIDUAL DEFENDANTS TO MOMENTUS

### A.   The Individual Defendants' Fiduciary Duties

97.   By reason of their positions as officers, directors and/or fiduciaries of Momentus, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe, the Company and its shareholders the fiduciary duties of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in

26

furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

98.     Each director and officer of the Company owed, and owes, to Momentus and its shareholders the fiduciary duties of due care, loyalty and good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets.  The duty of care requires informed, deliberative decision-making based on all material information reasonably available.  The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the Company and its shareholders.

99.     Each director and officer of the Company is required to act in furtherance of the best interests of Momentus and its shareholders to benefit all of the Company's shareholders equally, and not in furtherance of their personal interest or benefit.

100.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Momentus, were able to, and did, directly and indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  As senior officers and directors of a publicly held company whose stock was registered with the SEC under the Exchange Act and publicly traded, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

101.     At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.  Each of the Individual Defendants' conduct – who were officers and directors of the Company – was ratified by the remaining Individual Defendants who collectively comprised the Company's board of directors at all relevant times herein.

102.     To discharge their fiduciary duties, the officers and directors of Momentus were

27

required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

       (a)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

       (b)    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

       (c)    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

       (d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (e)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (h)    examine and evaluate any reports of examinations, audits, or other

28

financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

103.    Finally, because of their positions, the Individual Defendants directly and/or indirectly exercise control over Momentus, and, in doing so, each have knowledge of material, nonpublic information regarding the Company.

### B.    Corporate Governance Guidelines

104.    In addition to their fiduciary duties, Momentus's directors are required to abide by its Corporate Governance Guidelines (the "Guidelines"). The Guidelines provide, in relevant part:

> A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in a manner he or she reasonably believes to be in the best interests of the Company and its stockholders and other stakeholders. The Board regularly reviews the Company's long-term strategic business plans with the officers and other pertinent issues affecting the business of the Company. The Board assesses major risks facing the Company and management's approach to addressing such risks. The Board is also responsible for oversight of the Company's program to prevent and detect violations of law, regulation or Company policies and procedures. The Board reviews and, if appropriate, approves significant transactions. Directors must act with integrity and demonstrate a commitment to the Company, its values, business and long-term stakeholder value.

### C.    Audit Committee Charter

105.    In addition to the Corporate Governance Guidelines, the Company's Audit Committee Charter provides obligations to that committee's members. The Audit Committee Charter provides that the purpose of the committee is to:

> 1.1.1.  Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;
>
> 1.1.2.  Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;
>
> 1.1.3.  Provide the Board with the results of its monitoring and recommendations derived therefrom; and
>
> 1.1.4.  Provide to the Board such additional information and materials as it may

29

deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

106.    The following are the relevant obligations for those committee members listed in the Audit Committee Charter:

3.1.    Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

3.2.    Pre-approve all audit and permissible non-audit services and related engagement fees and terms for services provided to the Company by the independent auditors (or subsequently approving non-audit services in those circumstances where a subsequent approval is necessary and permissible);

3.3.    Review and provide guidance with respect to the external audit and the Company's relationship with its independent auditors by: (i) reviewing the independent auditors' proposed audit scope, approach and independence; (ii) obtaining on a periodic basis in accordance with applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") a written statement from the independent auditors regarding relationships and services with the Company which may impact independence or objectivity, and to the extent there are relationships, monitoring and investigating such relationships, including actively engaging in a dialogue with the independent auditors with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditors, and presenting such information to the Board; (iii) receiving and reviewing a report by the independent auditors describing any material issues raised by the most recent internal quality control review, or peer review, of the independent auditing firm, or by any inquiry or investigation by governmental or professional authorities and any steps taken to deal with any such issues; (iv) discussing with the Company's independent auditors the financial statements and audit findings, including any significant 3 adjustments, management judgments and accounting estimates, critical audit matters addressed during the audit, significant new accounting policies, any alternative treatments of financial information within GAAP that the independent auditor has discussed with management, ramifications of the use of these alternative disclosures and the treatment preferred by the independent auditor and disagreements with management and any other matters required to be discussed by applicable accounting standards; and (v) reviewing reports submitted to the Committee by the independent auditors in accordance with the applicable SEC requirements and other legal or regulatory requirements;

3.4.    Recommend to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by the PCAOB and the SEC, and (3) with the independent auditor concerning the independent auditor's independence;

3.5.    Review and discuss with management and the independent auditors the

30

annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

3.6.    Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10Q, using professional standards and procedures for conducting such reviews;

3.7.    Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

3.8.    Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

3.9.    Review the contents of the officer certifications to be filed with the SEC pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act and the process conducted to support the certifications;

3.10.    Consider the establishment, and oversee the activities, of any internal audit function within the Company;

3.11.    Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

3.12.    Oversee compliance with legal requirements for disclosure of the Company's independent auditor's services and Committee members, member qualifications and activities;

3.13.    Periodically review the Company's code of business conduct and ethics and approve any amendments thereto or waivers thereof, and perform those functions delegated to the Committee set forth in the Company's code of business conduct and ethics;

3.14.    Review, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

3.15.    Provide oversight and review at least annually of the Company's financial risk management policies, including its investment policies;

3.16. If necessary, institute special investigations with full access to all books, records, facilities and personnel of the Company;

3.17.    As appropriate, engage and obtain advice and assistance from outside

31

legal, accounting or other advisors with funding to be provided by the Company;

3.18.    Conduct appropriate review and oversight of related party transactions, as defined by applicable rules of the SEC and Nasdaq Stock Market;

3.19.    Review and assess the adequacy of this Charter and recommending any proposed changes to the Board for approval, on an annual basis;

3.20.    Review annually its own performance against the responsibilities outlined in this Charter and as otherwise established by the Board;

3.21.    Provide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

3.22.    Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

3.23.    Review and discuss with management, the independent auditor and the internal auditor, if any, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board;

3.23.    Review the adequacy and effectiveness of the Company's information and cyber security policies and the internal controls regarding information and cyber security and

3.24.    Review with management and members of internal audit, if any, the Company's business continuity and disaster preparedness planning.

3.25.    Oversee the implementation of the terms of the settled Securities and Exchange Commission's Order issued to the Company on July 13, 2021.

## VII.    BREACHES OF DUTIES AND HARM TO THE COMPANY

107.    Each Individual Defendant and Wrongful Refusal Defendant, by virtue of their position as a director and/or officer, owed to Momentus and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Momentus, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants and Wrongful Refusal Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Momentus, the absence of good faith on their part, and a reckless disregard for their duties to Momentus and its shareholders that the Individual Defendants and the Wrongful Refusal Defendants were aware, or should have been aware, posed a risk of serious injury to

32

1  Momentus.

2      108.  The Individual Defendants each breached their duty of loyalty, including the

3  subsidiary duties of good faith, oversight, and disclosure, by issuing, or causing the Company

4  to issue, false and/or misleading statements that misled shareholders into believing that

5  disclosures related to the Company's financial and business prospects were truthful and accurate

6  when made.

7      109.  The Individual Defendants breached their fiduciary duties owed to the Company

8  by knowingly causing, authoring and/or making false and misleading material statements and

9  omissions to the investing public.  The SEC Materials and Individual Defendants' own

10  statements discussed *supra*, all demonstrate that the Individual Defendants had actual

11  knowledge of the issues Momentus was facing but failed to accurately portray the Company's

12  true condition and financial prospects to investors.

13      110.  The Wrongful Refusal Defendants violated their fiduciary duties by failing to act

14  independently, in good faith, and within the realm of sound business judgment in considering

15  and responding to the Demand.

16      111.  Thus, the Individual Defendants, because of their positions of control and

17  authority as officers and/or directors of the Company, were able to, and did, directly, and/or

18  indirectly, exercise control over the wrongful acts complained of herein, as well as the contents

19  of the various public statements issued by the Company, which resulted in substantial harm to

20  the Company.

21      112.  By virtue of their positions as officers and directors, the Individual Defendants

22  owed the various fiduciary duties to the Company referenced above, including, among other

23  things, to exercise reasonable care and not injure the Company, to refrain from materially

24  misleading statements, to disclose all material information, and to provide shareholders with an

25  accurate landscape of the Company's operations and financial forecasts.

26      113.  The Individual Defendants breached their fiduciary duties and the obligations

27  imposed by the Guidelines.  These officers and directors caused or permitted the Company to

28  prevent and detect violations of law, regulation or Company policies and procedures.  Moreover,

33

the directors failed to act with integrity and, as evidenced by the decline in Momentus's share price, failed to preserve long-term stakeholder value.

114.    Moreover, Defendants Kugler, Reed, and Reiners served on the Board's Audit Committee during the Relevant Period.  Based on the inaccurate financial statements and material omissions, they failed to adequately oversee the Company's accounting and financial reporting processes, as well as its audits of the financial statements.

115.    The Individual Defendants' breaches of fiduciary duty and other misconduct will (and already have) cost the Company millions of dollars.  These damages include, without limitation, legal fees and investigative costs incurred in connection with the Securities Class Action, the SEC Action, and the various governmental investigations regarding Kokorich as a national security concern.  The Company will suffer further injury through compensation, benefits, and other payments to the Individual Defendants in light of their breaches of fiduciary duties and other misconduct.  Finally, the Company has and will suffer a loss of reputation and goodwill, as well as a "liar's discount," which will negatively impact future market capitalization.

## VIII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

116.    In committing the wrongful acts alleged herein, the Individual Defendants and Wrongful Refusal Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants and Wrongful Refusal Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

117.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

118.    The purpose and effect of the Individual Defendants' conspiracy, common

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

119.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

120.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IX.    **DAMAGES TO MOMENTUS**

121.    As a result of the Individual Defendants' wrongful conduct, Momentus conducted its affairs in evident violation of federal and state laws and regulations.  Moreover, the Company was caused to disseminate false and misleading statements, and omitted material information to make such statements not false and misleading when made.  This misconduct has devastated the Company's credibility.  The Company is the subject of the Securities Class Action and the SEC Action.  Momentus has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

122.    As a direct and proximate result of the Individual Defendants' actions as alleged above, the Company's market capitalization has been substantially damaged as a result of the misconduct described herein.

123.    Further, as a direct and proximate result of the Individual Defendants' conduct,

the Company has expended, and will continue to expend, significant sums of money.  Such expenditures include, without limitation:

      (a)     costs incurred in connection with being named a defendant in the Securities Class Action and the SEC Action, including the defense and settlement of or judgment in the litigation, as well as any other related litigation based on the same facts;

      (b)     costs incurred in connection with the lavish and unjustified compensation and benefits paid to management while they were actively breaching their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, which was based, at least in part, on the Company's artificially-inflated stock price;

      (c)     costs incurred from the loss of the Company's customers' confidence in Momentus and its products and services; and

      (d)     costs associated with the reputational harm suffered by Momentus as a result of the misconduct detailed herein, including loss of goodwill, increased borrowing costs, and loss of market capitalization and the resulting impact on the Company's ability to access the capital markets to raise money.

124.    Moreover, these actions have irreparably damaged Momentus's corporate image and goodwill.  For at least the foreseeable future, Momentus will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

125.    Finally, the Company has also suffered severe losses in market capitalization as a direct result of the Individual Defendants' wrongdoing alleged herein.

## X.    <u>DERIVATIVE AND DEMAND ALLEGATIONS</u>

126.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

127.    Plaintiff brings this action derivatively, in the right and for the benefit of

36

Momentus, to redress injuries suffered, and to be suffered, by Momentus as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Momentus is named as a nominal defendant solely in a derivative capacity.

128.    Plaintiff will adequately and fairly represent the interests of Momentus in enforcing and prosecuting its rights.

129.    Plaintiff is, and has continuously been, a shareholder of Momentus since prior to the start of the Relevant Period, and has been a shareholder at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein.

130.    As detailed below, Plaintiff's pre-suit Demand has been wrongfully ignored by the Board, forcing Plaintiff to file this shareholder derivative action on behalf of the Company.

131.    Given the Board's wrongful, bad-faith, and unreasonable failure to respond to Plaintiff's lawful Demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

**A.    Plaintiff's Demand Allegations**

132.    Plaintiff made her formal Demand on August 16, 2022, where she demanded that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into the Individual Defendants' violations of Delaware and federal law; and (ii) if warranted, commence a civil action against the Individual Defendants (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Individual Defendants) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein, as well as take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future.[3]

---

[3] Plaintiff's Demand contains references to confidential information produced to Plaintiff's counsel by the Company under Delaware General Corporation Law Section 220.  Plaintiff's Demand is incorporated by reference herein.  On September 12, 2022, Defendants' counsel sent Plaintiff's counsel a letter confirming receipt of the Demand.

133.    The Demand describes how the Individual Defendants have violated the core fiduciary duty principles described herein during the Relevant Period through their wrongful conduct, in the Federal Securities Class Action and the SEC Action.  To redress these wrongs and prevent such wrongdoing from occurring again in the future, Plaintiff demanded: (i) the Board should require the directors and officers to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action or any related or similar litigation or investigation arising from the misconduct stated above or in the SEC Action or Securities Class Action; (ii) the Board should require the directors and officers to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; (iii) the Board should require the directors and officers to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct; and (iv) the Board should adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future.

134.    After receiving no response to the Demand, on September 2, 2022 (the "September 2 Letter"), Plaintiff's counsel sent Defendants' counsel a letter requesting confirmation of receipt of the Demand and information regarding the steps, if any, the Board had taken to investigate the allegations detailed in the Demand.  A true and correct copy of the September 2 Letter is attached hereto as **Exhibit A**.

135.    On September 14, 2022, Plaintiff's counsel received a letter from Defendants' counsel (the "September 14 Letter") stating that they "have been assisting the Momentus Chief Legal Officer evaluate the Demand, and appropriately address it to members of the Momentus Board[.]"  The September 14 Letter further stated that the "Company currently views deferring its response to the Demand the better course in light of the pending California Derivative Action."  A true and correct copy of the September 14 Letter is attached hereto as **Exhibit B**.

136.    On September 22, 2022, Plaintiff's counsel sent Defendants' counsel a letter (the "September 22 Letter") and proof of Plaintiff's ownership in the Company's stock.   The September 22 Letter stated the reasons as to why the Board's deferral of the Demand is improper and contravenes Delaware law.   A true and correct copy of the September 22 Letter is attached hereto as **Exhibit C**.

137.    On January 20, 2023, Defendants' counsel sent Plaintiff's counsel a letter (the "January 20 Letter"), which states that "the Company continues to defer resolution of your request as it considers the propriety of forming a demand review committee to evaluate all shareholder demands asserted against the Company and the Company's rights and potential claims, to vindicate the best interests of the Company."   A true and correct copy of the January 20 Letter is attached hereto as **Exhibit D**.

138.    Since its receipt of the Demand, the Board has not provided Plaintiff with any substantive response, including any confirmation that the Board has done anything to either investigate or remedy the wrongdoing, mismanagement, and breaches of fiduciary duty as alleged herein.   Instead, the Board has chosen to continue ignoring the Demand, necessitating the commencement of this shareholder derivative action for wrongful refusal of the Demand.

**B.    The Board's Investigation Was Unreasonable Under Delaware Law And Its Refusal Of The Demand Was Not A Valid Exercise Of Business Judgment**

139.    As of the date of filing this complaint, Plaintiff's counsel has not received a response addressing the concerns detailed in the Demand and subsequent letters.   The Board failed to act independently, in good faith, and within the realm of sound business judgment when it failed to respond to the Demand substantively and instead deferred any investigation and/or remedial action, thereby effectively refusing it.

140.    The harms complained of in the Demand are actively ongoing and remain unremedied by the Board, causing further damage to the Company with each passing day.   In addition, while the Board is refusing to consider the allegations in the Demand, it is also actively forcing the Company to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the Company in the Securities Class Action and the SEC Action,

39

1  thereby further damaging the Company.

2      141.   Moreover, the Board's unreasonable deferral will subject the Company's claims

3  to the applicable statute of limitations period. These actions by the Board cannot be reasonably

4  interpreted to be in the best interests of the Company or in good faith. One of Plaintiff's motives

5  for issuing the Demand and this Complaint is to ensure that all of Momentus's claims are

6  properly adjudicated, including those facing any upcoming statute of limitations deadline.

7  Based on Plaintiff's information and belief, none of the Individual Defendants have executed

8  tolling agreements with the Company to preserve these claims. As such, if the Board were to

9  continue ignoring the Demand, the Company may waive certain claims belonging to it and suffer

10  additional harm as a result of Individual Defendants' wrongful conduct.

11      142.   Here, the Board has determined, without any investigation, to defer consideration

12  of the Demand indefinitely – throughout the pendency of the Securities Class Action and the

13  SEC Action, which could span months and even years into the future, particularly in the event

14  that either of these actions proceeds to summary judgment briefing and/or trial, and any

15  appeal(s). *See* **Exhibit B**.

16      143.   The Defendants' responses to the Demand and Plaintiff's September 22 Letter

17  have only provided Plaintiff with information demonstrating the incorrect basis for the Board's

18  decision to continue "deferring" the Demand. For example, the September 14 Letter claims that

19  "[t]he Company currently views deferring its response to the Demand the better course in light

20  of the pending California Derivative Action" and "the Company believes it would be prudent to

21  obtain the court's resolution of initial motions being filed in the Derivative Action and consider

22  that information along with a thorough assessment of the Securities Class Action and the SEC

23  Action before responding definitively to the Demand." **Exhibit B**. Accordingly, the September

24  14 Letter did not inform Plaintiff as to which action(s), if any, the Board was monitoring while

25  it continued to improperly defer the Demand, and set forth no investigation or remedial action.

26      144.   Moreover, the January 20 Letter states that "[t]he Company has been

27  investigating the claims identified in your previous letters and evaluating the claims asserted

28  against the company in two class actions, one currently pending in the U.S. District Court for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    the Central District of California, styled as *Haenisch et al. v. Kabot et al*, No. 2:21-cv-05744-

2    JFW-SHK (C.D. Cal. July 15, 2021) ("the Haenisch Matter"), and the other in the Court of

3    Chancery for the state of Delaware, styled as *Shirley et al. v. Kabot et al*., No. 2022-1023 (Del.

4    Ch. Nov. 10, 2022) ("the Shirley Matter")."  **Exhibit D**.  This is inconsistent with the September

5    22 Letter and again, demonstrates that the Board has improperly deferred the Demand, failed to

6    investigate, and failed to consider or implement any remedial action, polices, procedures, or

7    controls to prevent further harm to the Company.  Indeed, the more recently filed Haenisch

8    Matter only demonstrates additional basis for the wrongdoing alleged in the Demand.

9        145.    Plaintiff's September 22 Letter only offered to agree to the Board's deferral of

10   the Demand in exchange for: (i) an executed tolling agreement preserving the Company's

11   valuable claims against the wrongdoers as set forth in the Demand; (ii) an invitation to

12   participate in any mediation or settlement discussions in any related actions to ensure the

13   Company's interest were not being improperly compromised by, for example, releasing the

14   Company's claims against the wrongdoers or using Company funds to pay for the settlement of

15   the Securities Class Action; (iii) the production to Plaintiff of any documents produced in any

16   related actions; and (iv) a reservation of Plaintiff's rights to commence litigation on Company's

17   behalf during the pendency of the deferral.  *See* **Exhibit C**.  While the January 20 Letter offered

18   to provide Plaintiff with the documents produced "in response to demands from distinct

19   shareholders under Section 220," it declined to invite Plaintiff to any mediation or settlement

20   discussions and, more significantly, failed to respond to Plaintiff's request to enter into a tolling

21   agreement to preserve the Company's valuable claims against the wrongdoers.  *See* **Exhibit D**.

22   As such, Plaintiff has neither agreed to the Board's deferral nor have the issues raised in the

23   Demand or September 22 Letter been properly considered, investigated, and addressed by the

24   Board.

25       146.    The Board's unwarranted and egregious deferral of its consideration of the

26   Demand will unduly prejudice Plaintiff and the Company and is therefore a violation of

27   Delaware law.  The Board's actions thus constitute a wrongful refusal of the Demand.

28   Accordingly, Plaintiff has satisfied any demand requirement and may pursue this action on

1    behalf of the Company.

2        147.    Momentus has been and will continue to be exposed to significant losses due to

3    the Individual Defendants' wrongdoing.  Yet, the Wrongful Refusal Defendants have not filed

4    any lawsuits against any persons who were responsible for the wrongful conduct.  Thus, the

5    Wrongful Refusal Defendants continue to breach their fiduciary duties to the Company and face

6    a sufficiently substantial likelihood of liability for their breaches.

7        148.    Plaintiff has not made any demand on shareholders of Momentus to institute this

8    action since such demand would be a futile and useless act for the following reasons:

9            (a)    Momentus is a publicly traded company with thousands of shareholders

10                  of record and at least hundreds of thousands of beneficial owners;

11           (b)    Making demand on such a number of shareholders would be impossible

12                  for Plaintiff, who has no means of collecting the names, addresses, or

13                  phone numbers of Momentus's shareholders; and

14           (c)    Making demand on all shareholders would force Plaintiff to incur

15                  excessive expenses and obstacles, assuming all shareholders could even

16                  be individually identified with any degree of certainty.

17   **XI.    CLAIMS FOR RELIEF**

18                              **COUNT I**

19                       **Breach of Fiduciary Duty**
                **(Against the Momentus Individual Defendants)**

20

21       149.    Plaintiff incorporates by reference and realleges each and every allegation

22   contained above, as though fully set forth herein.

23       150.    The Momentus Individual Defendants owed fiduciary duties to Momentus and

24   its shareholders.  By reason of their positions as fiduciaries to the Company, the Momentus

25   Individual Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  The

26   Momentus Individual Defendants also owed Momentus fiduciary duties imposed and defined

27   by the federal securities laws, rules, regulations, and federal substantive corporate law, which

28   impose broad obligations on the Momentus Individual Defendants vis-a-vis the corporation and

                                        42

1   its individual shareholders.  In addition, the Momentus Individual Defendants have specific

2   fiduciary duties as defined by the Company's corporate governance documents, including its

3   Code of Business Conduct and Ethics, and principles that, had they been discharged in

4   accordance with the Momentus Individual Defendants' obligations, would have prevented the

5   misconduct and the consequent harm to the Company.

6       151.   The Momentus Individual Defendants violated these fiduciary duties by issuing,

7   causing to be issued, or otherwise allowing the material omissions and misrepresentations

8   described herein.  The Momentus Individual Defendants were well aware of the relevant

9   disclosure laws, rules, and regulations.

10      152.   The Momentus Individual Defendants consciously breached their fiduciary

11  duties and violated their corporate responsibilities in at least the following ways: affirmatively

12  and repeatedly making and/or failing to correct improper statements in press releases, SEC

13  filings, conference calls, and other public statements, relating to, among other things,

14  Momentus's business, operations, and growth prospects; failing to ensure the Company's

15  compliance with relevant legal and regulatory requirements, including but not limited to

16  requirements imposed under state and federal securities laws; and/or failing to implement and

17  maintain adequate internal controls.

18      153.   As a direct and proximate result of the Momentus Individual Defendants'

19  breaches of their fiduciary obligations, Momentus has sustained significant damages.

20  Accordingly, the Momentus Individual Defendants are liable to the Company.

21      154.   Plaintiff, on behalf of Momentus, has no adequate remedy at law.

**COUNT II**

**Breach of Fiduciary Duty**
**(Against the SRAC Individual Defendants)**

25      155.   Plaintiff incorporates by reference and realleges each and every allegation

26  contained above, as though fully set forth herein.

27      156.   The SRAC Individual Defendants, including Defendant Kabot who served as

28  both a SRAC director and Momentus director during the Relevant Period, owed and owe

43

1      Momentus fiduciary obligations.  By reason of their fiduciary relationships, the SRAC

2      Individual Defendants specifically owed and owe Momentus the highest obligation of loyalty,

3      due care, good faith, fair dealing, and candor in the administration of the affairs of the Company,

4      including, without limitation, the oversight of the Company's compliance with state and federal

5      securities laws, rules, and regulations, as well as the duty of candor and truthful disclosure with

6      respect to their public statements.

7          157.    The SRAC Individual Defendants also owed and owe Momentus fiduciary duties

8      imposed and defined by the federal securities laws, rules, regulations, and federal substantive

9      corporate law, which impose broad obligations on the Individual Defendants vis-a-vis the

10     corporation and its individual shareholders.  The SRAC Individual Defendants violated these

11     fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions

12     and misrepresentations described herein.

13          158.    As a direct and proximate result of the SRAC Individual Defendants' breaches

14     of their fiduciary obligations, has sustained significant damages.  Accordingly, the SRAC

15     Individual Defendants are liable to the Company.

16          159.    Plaintiff, on behalf of Momentus, has no adequate remedy at law.

17

18                                 **COUNT III**

19                          **Breach of Fiduciary Duty**
                         **(Against the Director Defendants)**

20          160.    Plaintiff incorporates by reference and realleges each and every allegation

21     contained above, as though fully set forth herein.

22          161.    The Director Defendants owed and owe Momentus fiduciary obligations.  By

23     reason of their fiduciary relationships, the Director Defendants specifically owed and owe

24     Momentus the highest obligation of loyalty, due care, good faith, fair dealing, and candor in the

25     administration of the affairs of the Company, including, without limitation, the oversight of the

26     Company's compliance with state and federal securities laws, rules, and regulations, as well as

27     the duty of candor and truthful disclosure with respect to their public statements.

28          162.    The Director Defendants also owed and owe Momentus fiduciary duties imposed

and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on the Director Defendants vis-a-vis the corporation and its individual shareholders.  The Director Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

163.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Business Conduct and Ethics and the charters of various Board committees, and principles that, had they been discharged in accordance with the SRAC Individual Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

164.    Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

165.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

> (i)    Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;
>
> (ii)    Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Momentus's business, operations, and prospects;
>
> (iii)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(iv)    Awarding Momentus's officers and directors lavish compensation packages despite their responsibility for the Company's willful misconduct; and

(v)    Reappointing certain directors who had failed in their duties to the Audit Committee.

166.    In addition, the Director Defendants violated these fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

167.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, has sustained significant damages. Accordingly, the Director Defendants are liable to the Company.

168.    Plaintiff, on behalf of Momentus, has no adequate remedy at law.

**COUNT IV**

**Aiding and Abetting Breach of Fiduciary Duty**
**(Against the Entity Defendants)**

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as fully set forth herein.

170.    The Entity Defendants had actual knowledge of the SRAC Individual Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and the Company has sustained significant damage as a result. Accordingly, the Entity Defendants are further liable to Momentus for aiding and abetting their fellow defendants' breaches.

171.    As the SRAC Individual Defendants, aided by the Entity Defendants, breached their fiduciary obligations, Momentus has sustained significant damages. Accordingly, the Entity Defendants are liable to Momentus.

172.    Plaintiff, on behalf of Momentus, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT V**

**Waste of Corporate Assets**
**(Against All Defendants)**

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    As a result of Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Momentus is subject to the Securities Class Action and the SEC Action. Accordingly, Defendants have caused Momentus to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

175.    As a result of their waste of corporate assets, Defendants are liable to the Company.

176.    Plaintiff, on behalf of Momentus, has no adequate remedy at law.

**COUNT VI**

**Unjust Enrichment**
**(Against All Defendants)**

177.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Momentus.  Defendants were unjustly enriched as a result of the compensation, remuneration and bonuses they received while breaching fiduciary duties owed to the Company.

179.    Moreover, through the proceeds they received through the Merger, the SRAC Defendants and the Entity Defendants were unjustly enriched at the expense and to the detriment of Momentus.

180.    Plaintiff, as a shareholder and representative of Momentus, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits,

47

and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

181.   Plaintiff, on behalf of Momentus, has no adequate remedy at law.

## COUNT VII

### Derivatively for Contribution Under Sections 10(B) and 21D of the Exchange Act
### (Against the Securities Class Action Defendants)

182.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.   During the Relevant Period, Momentus and the Securities Class Action Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff and other shareholders, as alleged herein; and (ii) caused Plaintiff and other shareholders to purchase Momentus common stock at artificially inflated prices.

184.   The Securities Class Action Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Momentus common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

185.   Momentus and the Securities Class Action Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

186.   During the Relevant Period, the Securities Class Action Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they

48

were made, not misleading.

187.   Momentus and the Securities Class Action Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Momentus and the Securities Class Action Defendants engaged in this misconduct to conceal Momentus 's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

188.   Plaintiff and the shareholders have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Momentus common stock. Plaintiff and other shareholders would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Momentus common stock had been artificially inflated by Defendants' fraudulent course of conduct.

189.   As a direct and proximate result of Momentus's and the Securities Class Action Defendants' wrongful conduct, Plaintiff and the other shareholders suffered damages in connection with their respective purchases of the Company's common stock during the Relevant Period.

190.   By virtue of the foregoing, Momentus and the Securities Class Action Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Finding that all of the defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

B.   Directing Momentus to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to

place before shareholders for a vote on the following corporate governance proposals, actions, or policies:

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Momentus to nominate three candidates for election to the Board;

- an accounting by the Momentus officers to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action or any related or similar litigation;

- the termination, for cause, any Company employee responsible for the wrongdoing alleged herein;

- the return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; and

- the payment of interest by Momentus officers, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct.

C.     Against each Defendant in favor of Momentus for the amount of damages sustained by Momentus, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        D.      Requiring Defendants to return to Momentus all compensation and remuneration

2                of whatever kind paid to them by the Company during the time that they were in

3                breach of their fiduciary duties;

4        E.      Directing Defendants to establish, maintain, and fully fund effective corporate

5                governance and compliance programs to ensure that Momentus 's directors,

6                officers, and employees do not engage in wrongful or illegal practices;

7        F.      Granting additional appropriate equitable and/or injunctive relief to remedy the

8                SRAC Defendants' misconduct, as permitted by law;

9        G.     Awarding Plaintiff the costs and disbursements of this action, including

10             reasonable attorneys' and experts' fees and expenses; and

11       H.     Granting such other and further relief as this Court deems just and equitable.

12 **XIII.**   **DEMAND FOR JURY TRIAL**

13      Plaintiff demands a jury trial as to all issues so triable.

14

15 Dated:  January 25, 2023         **JOHNSON FISTEL, LLP**

16                     By:  */s/ Brett M. Middleton*

17                          BRETT M. MIDDLETON

18                          FRANK J. JOHNSON
                                    JONATHAN M. SCOTT

19                          501 West Broadway, Suite 800
                                    San Diego, CA 92101

20                          Telephone: (619) 230-0063
                                    Facsimile: (619) 255-1856

21                          BrettM@johnsonfistel.com
                                    FrankJ@johnsonfistel.com

22                          JonathanS@johnsonfistel.com

23                          *Attorneys for Plaintiff Melissa Hanna*

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **<u>VERIFICATION</u>**

I, Melissa Hanna, hereby declare as follows:

I am a plaintiff in this action.  I have reviewed the allegations made in the foregoing verified shareholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant that the foregoing is true and correct.

Signed and Accepted:


Dated: 1/21/2023


DocuSigned by:

*MELISSA HANNA*

6A93CBD6A7254A8...

MELISSA HANNA