1  **JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
2  FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
3  BrettM@johnsonfistel.com
Jonathan M. Scott (SBN 323322)
4  JonathanS@johnsonfistel.com
501 West Broadway, Suite 800
5  San Diego, CA 92101
Telephone: (619) 230-0063
6  Facsimile: (619) 255-1856

7  *Counsel for Plaintiff*

8                 **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10

11  MELISSA HANNA, Derivatively on Behalf of    Case No. 5:23-CV-00374
MOMENTUS INC. (F/K/A STABLE ROAD
12  ACQUISITION CORP.),                          **NOTICE OF MOTION AND UNOPPOSED**
                                                 **MOTION FOR PRELIMINARY APPROVAL**
13                 Plaintiff,                    **OF DERIVATIVE SETTLEMENT AND**
                                                 **MEMORANDUM OF POINTS AND**
14        vs.                                    **AUTHORITIES**

15  BRIAN KABOT, JUAN MANUEL QUIROGA,            Hearing Date: October 3, 2024
JAMES NORRIS, JAMES HOFMOCKEL,               Hearing Time: 9:00 a.m.
16  MIKHAIL KOKORICH, DAWN HARMS,                Courtroom: 4, 5th Floor, San Jose Courthouse
FRED KENNEDY, CHRIS HADFIELD,
17  MITCHEL B. KUGLER, VICTORINO                 Judge: Hon. Edward J. Davila
MERCADO, KIMBERLEY A. REED, LINDA J.
18  REINERS, JOHN C. ROOD, STABLE ROAD
ACQUISITION CORP., and SRC-NI
19  HOLDINGS, LLC,

20                 Defendants,

21        and

22

23  MOMENTUS INC. (F/K/A STABLE ROAD
ACQUISITION CORP.),
24
                 Nominal Defendant.
25

26

27

28
                                i

1

## **<u>TABLE OF CONTENTS</u>**

2

I.      INTRODUCTION ..................................................................................................2

3

II.     OVERVIEW OF THE DERIVATIVE MATTERS ....................................................4

4

     A.      Summary of the Allegations ....................................................................4

5

     B.      Procedural Background.............................................................................5

6

III.    SETTLEMENT NEGOTIATIONS ...........................................................................9

7

IV.     TERMS OF THE SETTLEMENT ............................................................................9

8

     A.      Board Refreshment, Independence, and Education .........................................10

9

     B.      Enhancements To Board and Management Function
             By Improvements To The Management-Level Disclosure

10

             Committee And Management's Strategic Update Reports............................12

11

     C.      Management-Level Oversight Enhancements ..................................................13

12

V.      LEGAL STANDARDS FOR PRELIMINARY SETTLEMENT APPROVAL .........14

13

VI.     THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL....16

14

     A.      Great Weight Should Be Attributed
             To The Settling Parties' Belief That

15

             The Settlement Is Fair And Reasonable....................................................16

16

     B.      The Settlement Is The Product Of Arm's-Length Negotiations ......................17

17

VII.    THE SETTLEMENT IS WELL WITHIN
       THE RANGE OF POSSIBLE APPROVAL ............................................................19

18

VIII.   NOTICE TO CURRENT MOMENTUS STOCKHOLDERS ...................................22

19

IX.     PROPOSED SCHEDULE OF EVENTS....................................................................24

20

X.      CONCLUSION..........................................................................................................25

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

*In re AOL Time Warner S'holder Deriv. Litig.*,
No. 02 Civ. 6302(SWK), 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)........................................22

*Arace v. Thompson*,
No. 08 CIV. 7905 DC, 2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011)........................................24

*Bell Atl. Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993)........................................19

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ........................................21

*Clark v. Ecolab Inc.*,
No. 04CIV.4488PAC, 2010 WL 1948198 (S.D.N.Y. May 11, 2010)........................................16

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005)........................................19, 20

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)........................................18

*Gautreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982)........................................16

*George v. Acad. Mortg. Corp. (UT)*,
369 F. Supp. 3d 1356 (N.D. Ga. 2019)........................................18

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)........................................15

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)........................................18

*In re Apple Comput., Inc. Derivative Litig.*,
No. C 06-4128 JF (HRL), 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ........................................19

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000)........................................17

*In re Caremark Int'l Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996)........................................22

*In re First Cap. Holdings Corp. Fin. Prod. Sec. Litig.*,
No. MDL 901, 1992 WL 226321 (C.D. Cal. June 10, 1992)........................................16

*In re MRV Commc'ns, Inc. Derivative Litig.,*
No. CV 08-03800 GAF MANX , 2013 WL 2897874 (C.D. Cal. June 6, 2013) ............................23

*In re Nasdaq Mkt.- Makers Antitrust Litig.,*
176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................................................16

*In re NeuStar, Inc. Sec. Litig.,*
No. 1:14CV885 (JCC/TRJ), 2015 WL 8484438 (E.D. Va. Dec. 8, 2015)...................................16

*In re NVIDIA Corp. Derivative Litig.,*
No. C-06-06110-SBA(JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)...........................15, 19

*In re Pac. Enters. Sec. Litig.,*
47 F.3d 373 (9th Cir. 1995)................................................................................................16, 20

*In re Pfizer Inc. S'holder Derivative Litig.,*
780 F. Supp. 2d 336 (S.D.N.Y. 2011)........................................................................................19

*In re S. Co. S'holder Derivative Litig.,*
No. 1:17-CV-725-MHC, 2022 WL 4545614 (N.D. Ga. June 9, 2022) ......................................17

*In re Walt Disney Company Derivative Litigation,*
907 A.2d 693 (Del. Ch. 2005)..................................................................................................21

*Ingram v. The Coca-Cola Co.,*
200 F.R.D. 685 (N.D. Ga. 2001) ..............................................................................................18

*Kamen v. Kemper Fin. Servs. Inc.,*
500 U.S. 90 (1991) ...................................................................................................................21

*Levine v. Smith,*
591 A.2d 194 (Del. 1991) .........................................................................................................21

*Lewis v. Newman,*
59 F.R.D. 525 (S.D.N.Y. 1973) ................................................................................................20

*Lloyd v. Gupta,*
No. 15-CV-04183-MEJ, 2016 WL 3951652 (N.D. Cal. July 22, 2016)......................................15

*Maher v. Zapata Corp.,*
714 F.2d 436 (5th Cir. 1983)...............................................................................................15, 23

*Mills v. Elec. Auto-Lite Co.,*
396 U.S. 375 (1970) .................................................................................................................19

*Moore v. Verb Tech. Co., Inc.,*
No. CV 19-8393-GW-MAAX, 2021 WL 11732976 (C.D. Cal. Mar. 1, 2021).............................24

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
339 U.S. 306 (1950) .................................................................................................23

*Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.,*
No. CIV.A. 3443-VCP, 2009 WL 353746 (Del. Ch. Feb. 12, 2009)................................21

*Officers for Justice v. Civil Serv. Comm'n of San Francisco,*
688 F.2d 615 (9th Cir. 1982) ................................................................14, 15, 20, 22

*Scott v. ZST Digital Networks, Inc.,*
No. CV 11-3531 GAF (JCX), 2013 WL 12126744 (C.D. Cal. Aug. 5, 2013) ................17

*Spiegel v. Buntrock,*
571 A.2d 767 (Del. 1990) .........................................................................................21

*True v. Am. Honda Motor Co.,*
No. EDCV07-287-VAPOPX, 2009 WL 838284 (C.D. Cal. Mar. 25, 2009).............15, 22

*Unite Nat'l Ret. Fund v. Watts,*
No. CIV.A. 04CV3603DMC, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ....................20

*United States v. McInnes,*
556 F.2d 436 (9th Cir. 1977)....................................................................................14

*Unitrin, Inc. v. Am. Gen. Corp.,*
651 A.2d 1361 (Del. 1995) .......................................................................................17

*Villanueva v. Morpho Detection, Inc,*
No. 13-CV-05390-HSG, 2015 WL 4760464 (N.D. Cal. Aug. 12, 2015) .....................17

*Williams v. First Nat'l Bank,*
216 U.S. 582 (1910) .................................................................................................14

*Zapata Corp. v. Maldonado,*
430 A.2d 779 (Del. 1981) ...................................................................................17, 21

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE that on October 3, 2024, at 9:00 a.m., plaintiff Melissa Hanna ("Plaintiff Hanna" or "Plaintiff") will move before the Honorable Edward J. Davila, United States District Court Judge, to grant this Unopposed Motion for Preliminary Approval of Derivative Settlement ("Motion"), which settlement is set forth in the Stipulation and Agreement of Settlement dated August 26, 2024, (the "Stipulation" or "Stip."), and filed concurrently herewith.[1]  The Settlement resolves the above-captioned shareholder derivative case (the "Hanna Action") and the following related shareholder derivative matters: (1) *Rivlin v. Kabot, et al.*, Case No. 2:23-cv-03120 (C.D. Cal.) ("Rivlin Action"); (2) *Lindsey v. Quiroga, et al.*, Case No. 2023-0674 (Del. Ch.) ("Lindsey Action"); and (3) a litigation demand on the Board of Directors ("Board") of Momentus Inc. ("Momentus" or the "Company") by stockholder, Kamal Qureshi ("Litigation Demand," and collectively with the other actions, the "Derivative Matters").[2]  The Motion is based on the Memorandum of Points and Authorities, the Stipulation and exhibits thereto, and such additional evidence or argument as may be required by the Court.

**STATEMENTS OF ISSUES TO BE DECIDED AND RELIEF SOUGHT**

Whether the proposed settlement set forth in the Stipulation ("Settlement") is within the range of possible approval such that the form and means of notice of the Settlement pursuant to the Stipulation should be directed to Current Momentus Stockholders and the Court should set a hearing date to determine whether to finally approve the Settlement ("Settlement Hearing").  Plaintiff respectfully requests the Court enter an order preliminarily approving the Settlement, including approving dissemination of the Notice pursuant to the Stipulation and setting a Settlement Hearing.

---

[1] Unless otherwise noted, all capitalized terms have the same definition as set forth in the Stipulation, which is attached as Exhibit 1 to the Declaration of Brett M. Middleton in Support of Unopposed Motion for Preliminary Approval of Derivative Settlement.

[2] Plaintiffs Rivlin, Hanna, Lindsey, and stockholder Qureshi are referred to herein as "Plaintiffs."

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff respectfully submits this memorandum in support of the Motion for the Court to preliminarily approve the Settlement.[3]   The proposed Settlement resolves shareholder derivative claims brought on behalf of nominal defendant Momentus against the Individual Defendants in the above-captioned Hanna Action pending in this Court as well as the following related matters: the Rivlin Action; the Lindsey Action; and the Litigation Demand (collectively, and with the Hanna Action, the "Derivative Matters"). The Settlement is the product of extensive arm's-length negotiations between the Settling Parties, overseen by mediator Jed. D. Melnick, Esq. of JAMS ADR, Arbitration and ADR Services, who is experienced in mediating shareholder litigation matters (the "Mediator").  Stip., § I, C.

In connection with the proposed Settlement of the Derivative Matters, Momentus has agreed to maintain for at least four (4) years a comprehensive set of corporate governance reforms (the "Reforms") that will significantly improve Momentus's internal policies, procedures, and controls, including as to Momentus's Board of Directors' ("Board") independence and oversight of risk and public disclosures. Stip., § V., ¶¶ 2.1-2.2 & Ex. A.  The Reforms include: (i) the creation of a new Chief Compliance Officer ("CCO") position with detailed and extensive responsibilities; (ii) enhanced Board independence, including through the appointment of a new independent director and limitations on director and committee engagements outside of Momentus; (iii) enhancements to the duties and responsibilities of the management-level Disclosure Committee to help ensure timely and accurate public disclosures; (iv) enhanced Board reporting and oversight of strategic objectives and risks management; (v) the adoption of a Clawback Policy; and (vi) governance training requirements for each member of the Board and for key members of management.  Stip., Ex. A, at I.A-M.  The Reforms will reduce the chances that Momentus and its stockholders will

---

[3] The Settlement's terms are set forth in the Stipulation.

suffer a further loss of investor confidence and legal exposure, will enhance Momentus's value through better decision-making and the Board's oversight thereof, and will help ensure investor confidence in the accuracy of public disclosures, the integrity of Momentus's management, and the independence and effectiveness of the Company's corporate governance and Board oversight.

Significantly, the independent members of the Board shall have determined that the Settlement and each of its terms are fair, reasonable, and in the best interests of Momentus and its stockholders, that the Settlement, including the Reforms, confer substantial benefits upon the Company and its stockholders, and unanimously approved the Settlement. Stip., § IV. Momentus also acknowledged that the Derivative Matters were a material cause of the adoption, implementation, and maintenance of the Reforms by Momentus's Board, and that the Reforms provide substantial benefits to Momentus and its stockholders. Stip., §V., ¶¶2.2-2.3, 5.1.

After reaching agreement in principle on the material substantive terms for the Settlement, the Settling Parties commenced good faith, arm's-length negotiations concerning a fair and reasonable amount of attorneys' fees and expenses to be paid to Plaintiffs' Counsel, which were overseen and assisted by the Mediator. Stip., § V, ¶5.1. The Company's directors' and officers' liability insurance carriers have agreed to pay to Plaintiffs' Counsel an award of attorneys' fees and expenses in the total amount of $300,000 (the "Fee and Expense Amount"), subject to approval by the Court. *Id.* Plaintiffs believe that the Fee and Expense Amount is fair and reasonable in light of the substantial benefits conferred upon Momentus and Current Momentus Stockholders by the Settlement, and Defendants agree not to oppose Plaintiffs' request for an amount up to or including the Fee and Expense. *Id.* Stip., § V, ¶5.1.

At the preliminary approval stage, the Court need only determine that the proposed Settlement is within the range of what might be found to be fair, reasonable, and adequate, such that notice of the Settlement should be provided to Current Momentus Stockholders and a Settlement Hearing scheduled for consideration of final settlement approval. The proposed Settlement easily meets this standard. In addition, the proposed schedule and form and means of Notice of the Settlement are adequate to apprise Current Momentus Stockholders of the Settlement's terms and to afford them a fair opportunity to comment on the Settlement.

Accordingly, Plaintiff respectfully requests that the Court enter the [Proposed] Preliminary Approval Order (Exhibit B to the Stipulation, and separately submitted concurrently herewith) that grants preliminary approval of the proposed Settlement, directing that notice be given to Current Momentus Stockholders, and scheduling a hearing on final settlement approval (the "Preliminary Approval Order").

## II.   OVERVIEW OF THE DERIVATIVE MATTERS

### A.   Summary of the Allegations

Momentus, a Delaware corporation headquartered in San Jose, California, is a commercial space company that offers satellites, satellite buses, and other satellite components, transportation and infrastructure services, including hosted payloads and other in-orbit services, to help enable the commercialization of space.[4]

Momentus came to exist in its current form through a merger transaction (the "Merger") it conducted with Stable Road Acquisition Company ("SRAC"), a special purpose acquisition company ("SPAC"), and SRAC's affiliated subsidiaries.  ¶3.  SRAC was incorporated on May 28, 2019, in the state of Delaware with its headquarters located in Venice Beach, California.  Prior to the Merger, SRAC's stated purpose was to find and acquire a cannabis company.  SRAC completed its initial public offering ("IPO") on November 13, 2019, and on October 7, 2020, SRAC and Momentus Inc. ("Legacy Momentus") announced they had entered into a merger agreement. Pursuant to the Merger, which the Company consummated on August 12, 2021, Legacy Momentus' business operations became the public Company's operations.

Plaintiffs allege that, beginning in at least October 2020, the Individual Defendants caused the Company to engage in a pattern of deceptive disclosures to artificially inflate the Company's reported financial performance.  ¶187.  For example, the Company's officers and directors are alleged to have failed to disclose to investors that: (i) the federal government had determined that

---

[4] ¶2.  Unless otherwise noted, all references to "¶__" or "¶¶__" are to the Verified Shareholder Derivative Complaint filed by Plaintiff in the Hanna Action on January 25, 2023. (ECF No. 1.).

the founder of the Company's legacy business, Defendant Kokorich, was a threat to national security; (ii) Momentus had never successfully tested its technology in space; (iii) the projections of Momentus' future revenues were grossly overstated; and (iv) the defendants failed to ensure that the Company maintained proper policies, procedures, and controls to protect Momentus from harm caused by the issuance of false and misleading statements. ¶¶70, 165. In addition, the Derivative Matters also allege that the Company overpaid significantly for acquiring Legacy Momentus and that certain of the Defendants improperly solicited and benefited from the proxy solicitation issued in connection with the Merger to the Company's detriment. Stip., § I, A.

Plaintiffs allege that, as a result of the Individual Defendants' and the Sponsor's alleged mismanagement, self-dealing, and wrongdoing, the Company suffered significant harm. Among other damages to Momentus, Plaintiffs allege that the Individual Defendants' misconduct exposed Momentus to liability in the consolidated federal securities class action brought in the United States District Court for the Central District of California, which is captioned *In re Stable Road Acquisition Corp. Securities Litigation*, Case No. 2:21-cv-05744 (the "Securities Class Action"). ¶¶8, 92. The Individual Defendants have denied any wrongdoing. On August 18, 2023, the parties in the Securities Class Action agreed to a settlement of $8.5 million. Stip., § I, A. The Company also faced actions by the U.S. Securities and Exchange Commission ("SEC"), naming as defendants SRAC, the Sponsor, Kabot, and Kokorich (the "SEC Actions"). ¶6. All parties apart from Kokorich settled the SEC Actions, with the settlement terms including more than $8 million in penalties. *Id.*

## B.    Procedural Background

### 1.    The Hanna Action

On August 16, 2022, Plaintiff Hanna made a formal litigation demand ("Demand") to the Board where she demanded that the Board: (i) undertake an independent internal investigation into the Individual Defendants' violations of Delaware and federal law; and (ii) if warranted, commence a civil action against the Individual Defendants (and any others who may be similarly liable) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their alleged breaches of fiduciary duties, as well as take additional affirmative action to redress

the wrongdoing and prevent such wrongdoing from occurring again in the future.  The Demand described how the Individual Defendants allegedly violated their fiduciary duties as a result of the alleged wrongful conduct in the Securities Class Action and the SEC Actions.  *See* Stip., § I.B.1.

After receiving no response to the Demand, on September 2, 2022, Plaintiff sent a letter requesting confirmation of receipt of the Demand and information regarding the steps, if any the Board had taken to investigate the allegations detailed in the Demand.  ¶134; Stip., § I.B.1.  On September 14, 2022, Defendants sent Plaintiff a letter concluding that the "Company currently views deferring its response to the Demand the better course of action in light of the pending California Derivative Action."  ¶135.  On September 22, 2022, Plaintiff informed Defendants by letter the numerous reasons why the Board's decision to defer investigating the allegations in the Demand were improper and in contravention of Delaware law.  ¶136.  Regardless, on January 20, 2023, Defendants sent Plaintiffs further confirmation that they would continue to defer any investigation of the matter.  ¶137.

After receiving the Demand, Plaintiff alleged the Board failed to provide any substantive response concerning any action taken to protect the Company's valuable claims (such as a tolling agreement) or investigate the allegations in the Demand concerning the alleged mismanagement and wrongdoing.  Plaintiff considered the Board's refusal to enter into a tolling agreement with the Individual Defendants and alleged failure to respond to the Demand as a *de facto* refusal to act upon the Demand and initiated this action on January 25, 2023, accordingly.  *See* Stip., § I.B.1.

On April 12, 2023, the parties stipulated to stay the Hanna Action until August 4, 2023, which the court ordered on April 19, 2023. *See id*.  Then, after the parties agreed to mediate the matter, on August 18, 2023, the parties stipulated to continue the stay pending the outcome of the mediation, which the Court ordered on August 21, 2023.  *See id*.  As mediation efforts continued, the parties further stipulated to extend the stay in November 2023 and January 2024.  *See id*.  The parties filed status reports with the court informing it of the progress of the settlement negotiations.  ECF Nos. 24, 26, 28, 30.  The court then set a date for a status conference regarding settlement on September 5, 2024, and ordered the parties to file a joint status report regarding the status of settlement on or before August 23, 2024.  *See id*.

1

2.      **The Rivlin Action**

On April 25, 2023, Plaintiff Rivlin initiated a derivative action on the Company's behalf against a subset of the Individual Defendants in the United States District Court for the Central District of California captioned *Rivlin v. Kabot, et al.*, Case No. 2:23-cv-03120 (C.D. Cal.).  On July 14, 2023, these defendants filed motions to dismiss (*See* Stip., § I.B.2), and Plaintiff responded by filing a Verified Amended Shareholder Derivative Complaint, in which it named additional Individual Defendants and the Sponsor as defendants.  *See* Stip., § I.B.2.  The parties then stipulated to extend defendants' deadlines to respond to the amended complaint to allow the parties to engage in good faith settlement negotiations by way of mediation.  Following this, the parties vacated all deadlines for the Rivlin Action and submitted status reports to the Court regarding the status of the settlement negotiations.  *See* Stip., § I.B.2.

The Rivlin Action alleges that defendants violated Section 14(a) of the Exchange Act, breached their fiduciary duties, and engaged in related additional misconduct between October 7, 2020, and November 22, 2022, and pleads that demand on the Board would have been futile and is thus, excused.  *See* Stip., § I.B.2.  The Rivlin Action also alleges breach of fiduciary duty claims that raise a federal question based on claims made in the Securities Class Action for making false and misleading statements and omissions in violation of the federal securities laws and seeks contribution under Section 10(b) and 21D of the Exchange Act against the Sponsor and Defendants Kabot, Kokorich, Harms, and Kennedy.  *See id.*

3.      **The Lindsey Action**

Plaintiff Lindsey made a formal demand on the Board on October 28, 2022, to investigate and commence legal proceedings against certain directors, executive officers and agents of the Company.  On November 10, 2022, counsel to the Board responded to Plaintiff Lindsey's demand in an email, stating that the Board was reviewing the October 28, 2022, demand and would provide a response shortly.  *See* Stip., § I.B.3.

Then, on January 20, 2023, the Board's counsel sent Plaintiff Lindsey a letter, stating: "Given the time that remains before expiration of the applicable statutes of limitations, as well as the similarity between the Haenisch/Shirley Matters and the litigation proposed in your previous

correspondence, the Company defers resolution of your request as it considers the propriety of forming a demand review committee to evaluate all shareholder demands asserted against the Company and the Company's rights and potential claims to vindicate the best interests of the Company." *See id.*

The Board allegedly failed to act upon Plaintiff Lindsey's demand and five more months passed. Plaintiff Lindsey considered the Board's refusal to enter into a tolling agreement with the Individual Defendants and failure to respond to his demand as more delay and as a *de facto* refusal to act upon his demand. On June 30, 2023, Plaintiff Lindsey filed his demand refused derivative action in Delaware Chancery Court. *See id.*

On July 24, 2023, the parties to the Lindsey Action stipulated to extend time for Defendants to move or otherwise respond to Plaintiff Lindsey's complaint (Lindsey Dkt. No. 15), which was granted on July 25, 2023. Lindsey Dkt. No. 16. The court further extended the time for Defendants to move or otherwise respond to the complaint on September 20, 2023, and November 20, 2023. Lindsey Dkt. Nos. 17, 19. *See id.*

On January 18, 2024, following the settlement negotiations (detailed *infra*) the court vacated the deadline for the Defendants to move or otherwise respond to Plaintiff Lindsey's complaint, and ordered the parties to either submit a status report regarding settlement negotiations or submit a stipulation of settlement and motion papers. *See id.* The parties to the Lindsey Action filed status reports to the court informing it of the status of settlement negotiations on February 16, 2024, March 18, 2024, and May 17, 2024. *See id.*

### 4.   The Litigation Demand

On February 21, 2023, counsel for Plaintiff Hanna sent the Board a letter informing it that another Momentus stockholder, Kamal Qureshi ("Qureshi"), had reviewed Plaintiff Hanna's Demand and was formally joining it in its entirety, as if it was originally served on his behalf. *See* Stip., § I.B.4. Hanna and Qureshi both previously served books and records demands pursuant to 8 *Del. C.* § 220, entered into mutually agreed upon confidentiality agreements, and received documents from the Company. *See id.* Counsel for the Board acknowledged Qureshi's joinder to the Demand in a letter sent to Plaintiff Hanna's and Qureshi's counsel on March 1, 2023, but

allegedly failed to provide Qureshi with any substantive update regarding any investigation of the allegations made in the Demand.  *See id.*

## III.    SETTLEMENT NEGOTIATIONS

On October 25, 2023, the Settling Parties attended a full day mediation (the "Mediation") with the Mediator.  *See* Stip., § I.C.  In advance of the Mediation, Plaintiffs Hanna and Lindsey submitted detailed settlement demands to Defendants.  *See id.*  Although the Settling Parties did not settle the claims at the October 25, 2023, Mediation, the Parties made meaningful progress and thereafter continued their settlement negotiations, with the Mediator's assistance.  *See id.*  Detailed written proposals and counter-proposals were exchanged and debated in numerous communications over the next several months.  Ultimately, on February 14, 2024, the Parties reached an agreement in principle on the corporate governance Reforms that will be adopted by Momentus as consideration for a global resolution of the Derivative Matters.  *See id.*

After reaching agreement in principle on the substantive consideration for the Settlement, the Settling Parties commenced good faith, arm's-length negotiations concerning a fair and reasonable amount of attorneys' fees and expenses to be paid to Plaintiffs' Counsel, overseen and assisted by the Mediator.  The Company's directors' and officers' liability insurance carriers have agreed to pay to Plaintiffs' Counsel an award of attorneys' fees and expenses in the total amount of $300,000 (the "Fee and Expense Amount"), subject to approval by the Court.  Plaintiffs believe that the Fee and Expense Amount is fair and reasonable in light of the substantial benefits conferred upon Momentus and Current Momentus Stockholders by the Settlement, and Defendants agree not to oppose Plaintiffs' request for an amount up to or including the Fee and Expense Amount.

Thereafter, the Settling Parties negotiated and finalized the formal operative terms of the Settlement as set forth in the Stipulation.  *See* Stip., § I.C.

## IV.    TERMS OF THE SETTLEMENT

Pursuant to the Settlement, Momentus has agreed to adopt and maintain the Reforms for at least four (4) years subject to the terms of the Stipulation.  The Reforms are designed to prevent the alleged lapses in Board and management supervision of core operations and risks that Plaintiffs

contend contributed to Momentus's failure to disclose material facts concerning the Company's technology development and the adequacy of its internal controls. Plaintiffs submit the Reforms will materially reduce the likelihood that similar missteps will be repeated, and Momentus acknowledges that the Derivative Matters were a material cause in the adoption and implementation of the Reforms – which Momentus also acknowledges confer substantial benefits upon Momentus and its current stockholders. *See* Stip., § V., ¶¶ 2.1-2.3.

Plaintiffs contend that ineffective Board oversight, lax internal reporting practices, and weak controls at the management level allowed management to misstate and fail to accurately disclose, among other things: (i) the federal government had determined that the founder of the Company's legacy business, Defendant Kokorich, was a threat to national security; (ii) Momentus had never successfully tested its technology in space; (iii) the projections of Momentus' future revenues were grossly overstated; and (iv) the due diligence of Momentus was superficial, ignored red flags that necessitated further investigation, and did not provide a reasonable basis for the public statements about Momentus and its Merger with SRAC. *See* Stip., § I.A. As detailed below, the Reforms address this breakdown in corporate governance by combining enhancements to the Board's and its committees' independence and oversight of critical risks and disclosures, with enhancements to training, monitoring and reporting by the Management-level Disclosure Committee, the Board itself, and key management personnel in order for oversight to be continuous, fully informed, and effective and by providing additional policies and positions to facilitate compliance.

### A.    Board Refreshment, Independence, And Education

*First*, Momentus shall nominate one new independent director for approval by the stockholders upon the attainment of the Additional Director Financial Benchmark. Momentus acknowledges that the Derivative Matters were a material cause underlying this and the entirety of the Reforms. Stip., Ex. A, at I.H; Stip., § V, ¶2.2.

*Second*, at least 70% of the Board will continuously be composed of members that meet the independence standards of NASDAQ Stock Exchange and will be limited in the number of outside committee or director engagements, in addition to serving Momentus. Stip., Ex. A, at I.I, I.E.

*Third*, within one (1) year after the settlement (and six months of joining the Board for new directors) each member of the Board shall receive training focused on the Company's business and industry, committee roles and responsibilities, and legal and ethical responsibilities of directors, including rules and regulations regarding public disclosures, GAAP, the Sarbanes-Oxley Act of 2002, standards governing internal controls over financial reporting, and reporting requirements for public-traded corporations.  Stip., Ex. A, at I.J.  This training shall be in the form of continuing education courses, including courses from the National Association of Corporate Directors, Stanford Law School Directors' College, the Vanderbilt Directors' College, Dartmouth Tuck School, or similar programs.  *Id.*

*Fourth*, the Board's oversight and risk management duties shall be enhanced by requiring, *inter alia*, that it: (i) oversee the identification and monitoring of material risks relating to Momentus' compliance with all applicable laws and regulations and public disclosures (including all SEC filings) about Momentus' business affairs, financial reporting, and risk exposure and whenever any material risks are  identified, consider actions for mitigating and disclosing these risks; (ii) oversee the Compensation Committee to assess on an annual basis the Chief Executive Officer's and Chief Financial Officer's contribution to Momentus' culture of ethics and compliance and their effectiveness and dedication to ensuring Momentus' compliance with applicable laws, rules, and regulations; (iii) receive at least annual reviews from management regarding the effectiveness of Momentus' internal controls over Momentus' legal and regulatory compliance; (iv) oversee risks relating to Momentus' dissemination of information regarding product or technology development and progress; and (v) oversee risks relating to contracts and relationships with third-party original equipment manufacturers and vendors.  Stip., Ex. A, at I.A.

*Fifth*, the Chief Legal Officer or Chief Compliance Officer shall update the Board at each regular quarterly Board meeting regarding: (i) any material violations by the Company that are raised by the SEC, DOJ, or other regulatory agencies that fall under their respective purviews; and (ii) any material adverse developments or significant new information relating to technology or product testing that would potentially change the scope of product development, manufacturing, marketing and sales.  Stip., Ex. A, at I.B.  The Chief Legal Officer and Chief Compliance Officer

shall also meet with the independent members of the Board in executive session to review any concerns identified by the Company or material compliance issues raised by the SEC, DOJ, or other regulatory agencies. *Id.*

*Sixth*, Momentus shall require that Board materials be sent to Board members at least a week prior to any Board meeting, or as far in advance as possible if a week prior is impractical. Momentus shall also impose additional limitations on director and committee engagements outside the Company, including requiring that (i) the chair of the Company's Audit Committee not serve as the chair of the Company's Compensation Committee, and vice versa; (ii) no director, without approval by the Board, may serve on more than two other public companies' boards of directors; and (iii) the Company's Chief Executive Officer may not simultaneously serve as chairman of the board of another public company. Finally, all directors shall be required to attend the Company's annual meeting of stockholders, either "virtually" (i.e., online) or in person, absent any extraordinary circumstances limiting their attendance. Stip., Ex. A, at I.F.

### B. Enhancements To Board and Management Function By Improvements To The Management-Level Disclosure Committee And Management's Strategic Update Reports

The Settlement combines the foregoing enhancements to the Board's independent oversight with improvements to the Board's supervisory responsibilities and protocols and enhanced management-level support in critical areas, as set forth below.

*First*, Momentus's Management-level Disclosure Committee (the "Management Committee") shall be enhanced to assure: (i) the accuracy of any material information disseminated via corporate disclosure channels delivering information to investors; (ii) truthful and accurate filings with the SEC; and (iii) adequate internal controls concerning the Company's audited financial statements. Stip., Ex. A, at I.K. The Company shall develop a Charter for the Management Committee which shall be posted on Momentus' website. Moreover, the Management Committee shall be responsible for the creation and implementation of controls and policies to regulate both regular and interim public disclosures to stockholders, including via the Company's SEC filings and non-SEC platforms. The Management Committee shall also be required to provide a sub-

certification to the Certifying Officers before filing each SEC Periodic Report as to (i) the Management Committee's compliance with the Company's Disclosure Policy and this Charter, and (ii) the Management Committee's conclusions resulting from its evaluation of the effectiveness of the Disclosure Controls.  *Id.*

*Second*, on no less than an annual basis, the Board shall receive a strategic operating plan (the "Strategic Operating Plan") from management concerning: (a) potential material strategic alternatives,; (b) an evaluation and the progress of prior strategic operating plan(s) and related initiatives; (c) a review of acquisition, sale, spin-off, and/or investment strategies; and (d) following any material acquisition, sale, spin-off, or investment, a review of the status of the integration of the business units and/or products materially impacted by such transaction.  Stip., Ex. A, at I.C.  The Board shall review and discuss the Strategic Operating Plan with management. The Board's consideration of such matters shall be documented in the Board's minutes.  *Id.*

*Third*, the Board shall adopt a Clawback Policy providing that the Company may reduce or recoup the value of incentives awarded to certain company personnel for achieving financial objectives while failing to comply with laws and regulations or failing to adhere to the Company's Code of Business Conduct & Ethics.  Stip., Ex. A, at I.G.  The Company shall disclose the specific protocol used to determine whether its Clawback Policy has been triggered (including who reviews this, how often, and which decision-making process was used).  *Id.*

### C.    Management-Level Oversight Enhancements

*First*, the Management Committee shall select key members of management, including key gatekeepers in the internal control processes (*e.g.,* those with approval authority or certification responsibilities), to receive training on the Company's Corporate Governance Guidelines, Code of Business Conduct, Supplemental Code of Business Conduct and Ethics, and Best-in-Class Practices within one (1) year after the settlement, and from time to time thereafter as determined by the Management Committee.  *See* Stip., Ex. A, at I.L.

*Second*, Momentus shall formally designate a CCO with responsibility for managing the Company's ethics and compliance program and for assisting the Board in fulfilling its oversight

duties regarding the Company's compliance with applicable laws, regulations, and accounting standards, and the dissemination of true and accurate information.  *See* Stip., Ex. A, at I.M.  The CCO shall be designated as a member of the Company's Management Committee.  The CCO or their designee shall: (a) oversee and administer the Company's corporate governance policies; (b) work with the Management Committee, Audit Committee, and Disclosure Committee to evaluate and define the goals of the Company's ethics and compliance program in light of trends and changes in laws which may affect the Company's compliance with laws relating to disclosure of the Company's risk exposure; (c) manage and oversee Momentus's ethics and compliance program and implement procedures for monitoring and evaluating the program's performance; (d) review Momentus's draft quarterly and annual reports to be filed with the SEC and drafts of earnings press releases or other earnings materials, and, if requested, confer with the Management Committee, Disclosure Committee, or Audit Committee regarding the contents of such disclosures; (e) oversee employee training in risk assessment and compliance; (f) promptly report to the Audit Committee any significant compliance and ethics issues or concerns, including but not limited to any significant allegations of financial fraud or disclosure and/or reporting violations; and (g) work with the Company's Chief Legal Officer, outside legal counsel, and the Disclosure Committee to evaluate the adequacy of the Company's internal controls over compliance and developing proposals for improving these controls.  *Id*.

## V.    LEGAL STANDARDS FOR PRELIMINARY SETTLEMENT APPROVAL

It is well-settled that "compromises of disputed claims are favored by the courts."  *Williams v. First Nat. Bank*, 216 U.S. 582, 595, 30 S. Ct. 441, 445, 54 L. Ed. 625 (1910);[5] *see also Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982) (recognizing that the "settlement process [is] favored in the law"); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("there is an overriding public interest in settling and quieting litigation").  Settlements are particularly favored "'in class actions and other complex cases [such as derivative

---

[5] Emphasis throughout is added and citations and footnotes are omitted unless otherwise noted.

actions] where substantial judicial resources can be conserved by avoiding formal litigation.'" *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA(JCS), 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008); *see also Lloyd v. Gupta*, No. 15-CV-04183-MEJ, 2016 WL 3951652, at *3 (N.D. Cal. July 22, 2016) ("Settlements of derivative actions are particularly favored because the cases are notoriously difficult and unpredictable.").[6]

Under Rule 23.1, derivative claims may not be settled, voluntarily dismissed, or compromised without Court approval. Fed. R. Civ. P. 23.1(c). "Review of a proposed settlement generally proceeds in two stages, a hearing on preliminary approval followed by a final fairness hearing." *True v. Am. Honda Motor Co.,* No. EDCV07-287-VAPOPX, 2009 WL 838284, at *3 (C.D. Cal. Mar. 25, 2009) (citing Manual for Complex Litigation, §21.632 (4th ed. 2004) ("Manual")). While Plaintiffs believe that the Settlement merits final approval, the Court need only ***preliminarily*** approve the Settlement at this time. At the preliminary approval stage, the Court's review of the proposed Settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

This is a low threshold, requiring the Court to determine only "whether a proposed settlement is 'within the range of possible approval' and that notice should be sent to" stockholders. *True*, 2009 WL 838284, at *3; *see also* Manual at §13.14 ("First, the [court] reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing. If so, the

---

[6] *See also Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'").

final decision on approval is made after the hearing.").[7]  Where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, ... and falls within the range of possible approval, preliminary approval is granted."  *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

Thus, at this preliminary stage, the Court need only conclude that the Settlement is within the range of possible approval for the purposes of providing notice to Current Momentus Stockholders and holding the Settlement Hearing.  Plaintiffs respectfully submit that the Settlement is well "within the range" of possible approval and should therefore be preliminarily approved.

## VI.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.   Great Weight Should Be Attributed To The Settling Parties' Belief That The Settlement Is Fair And Reasonable

As a threshold matter, the Settling Parties believe that the proposed Settlement represents a fair, reasonable, beneficial, and practical resolution of highly uncertain and complex litigation, and that its terms fairly account for the risks and potential rewards of the claims.  As the Ninth Circuit recognized, significant weight should be attributed to the parties' belief that litigation should be settled on proposed terms, since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *see In re First Cap. Holdings Corp. Fin. Prod. Sec. Litig.*, No. MDL 901, 1992 WL 226321, at *2 (C.D. Cal. June 10, 1992) (finding belief of counsel that proposed settlement was best result for the class to be compelling factor in approving settlement); *Clark v. Ecolab Inc.*, No. 04CIV.4488PAC, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) ("'Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment, for that of the parties who negotiated the settlement.'") (alteration in original); *In re NeuStar, Inc. Sec. Litig.*, No. 1:14CV885 (JCC/TRJ), 2015 WL 8484438, at *4 (E.D. Va. Dec. 8,

---

[7] *See also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (purpose of preliminary approval hearing is "to ascertain whether there is **any reason** to notify the class members of the proposed settlement and to proceed with a fairness hearing") (emphasis added).

2015) (where plaintiffs' counsel are '"nationally recognized members of the securities litigation bar,'" the Court "may pay heed to [Plaintiffs'] Counsel's judgment in approving, negotiating, and entering into a putative settlement").

The independent members of Momentus's Board believe the Settlement is in the best interests of and confers substantial benefits upon Momentus and its stockholders, and have (or will have) approved a resolution reflecting this belief. Stip., § IV. Momentus acknowledges that the Derivative Matters were a material cause in the adoption and implementation of the Reforms by Momentus's Board, and that the Reforms confer substantial benefits upon Momentus and its current stockholders. Stip., § V., ¶¶ 2.2-2.3, 5.1; *see Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *In re S. Co. S'holder Derivative Litig.*, No. 1:17-CV-725-MHC, 2022 WL 4545614, at *6 (N.D. Ga. June 9, 2022) ("The directors' exercise of business judgment with respect to the Settlement warrants substantial judicial deference."); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness").

In sum, this unanimous agreement that the Settlement, including each of its terms, is in the best interests of Momentus and its stockholders is compelling and supports preliminary approval.

**B.     The Settlement Is The Product Of Arm's-Length Negotiations**

The Settlement was achieved through significant arm's-length negotiations by well-informed counsel. Where "the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex ... litigation, the Settlement will enjoy a presumption of fairness." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000); *see also Villanueva v. Morpho Detection, Inc*, No. 13-CV-05390-HSG, 2015 WL 4760464, at *6 (N.D. Cal. Aug. 12, 2015) (same); *Scott v. ZST Digital Networks, Inc.*, No. CV 11-3531 GAF (JCX), 2013 WL 12126744, at *6 (C.D. Cal. Aug. 5, 2013) (same). Here, the Settlement was negotiated between experienced counsel possessing a firm understanding of the strengths and weaknesses of the claims and defenses asserted, is the product

of significant give and take by the Settling Parties, and was reached after extensive negotiations between the Settling Parties and their respective counsel.  *See* Stip., § I.C.[8]

The assistance of the neutral, well-respected Mediator provides further assurances that the Settlement was reached fairly.  *See* Stip., § I.C; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement ... helps to ensure that the proceedings were free of collusion and undue pressure"); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1370 (N.D. Ga. 2019) ("mediation with an experienced mediator ... further confirms that the process was procedurally sound and not collusive").

Each of the Settling Parties was represented by zealous and able counsel with extensive experience in complex derivative litigation, and who were well-informed about the legal and factual issues presented.  Plaintiffs and Plaintiffs' Counsel conducted extensive research and investigation into the Individual Defendants' alleged misconduct and the corresponding alleged damages to the Company.  This investigation included, *inter alia*: (i) reviewing internal books and records produced by the Company pursuant to books and records demands; (ii) reviewing and analyzing Momentus' public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; (iii) reviewing and analyzing the allegations contained in the related Securities Class Action; (iv) researching, drafting, and filing stockholder derivative complaints; (v) researching the applicable law with respect to the claims asserted (or which could be asserted) in the Derivative Matters and the potential defenses thereto; (vi) researching and assessing corporate governance issues; (vii) preparing detailed litigation and settlement demands on behalf of various

_____

[8] While the Court need not address the agreed-to Fee and Expense Amount until the final approval stage, it bears mention that courts afford similar deference to arm's-length fee negotiations. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (noting that negotiated fees are strongly preferred over contested fee applications, as "[a] request for attorney's fees should not result in a second major litigation"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (where there is no evidence of collusion and no detriment to the parties, "the Court should give substantial weight to a negotiated fee amount").

Plaintiffs and a mediation statement; (viii) participating in the Mediation; (ix) engaging in extensive pre- and post-mediation settlement discussions and exchanging extensive corporate governance reforms and counteroffers, with the Mediator and counsel for the Defendants; and (x) negotiating and drafting the settlement documentation for presentment to the Court.  Stip., §II.

The accumulation of the information discovered through the above efforts permitted Plaintiffs and Plaintiffs' Counsel to be well-informed about the strengths and weaknesses of the derivative claims and to engage in effective settlement negotiations with Defendants.

## VII.   THE SETTLEMENT IS WELL WITHIN THE RANGE OF POSSIBLE APPROVAL

In determining whether to approve a stockholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (omission in original); *see In re Apple Comput., Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("principal factor to consider … is the benefit to [the real party in interest] as compared to the risks posed by derivative litigation").  "Strong corporate governance is fundamental to the economic well-being and success of a corporation[;]" accordingly, courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *3; *see also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature.").

Courts, therefore, approve settlements based on corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws[.]" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005).  Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators or prosecutors." *Id*.; *see In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement of derivative action where corporate benefits "significantly improved institutional

structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, No. CIV.A. 04CV3603DMC, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (non-monetary "relief [that] is intended to prevent future harm" supports settlement).

Here, as discussed above, the Reforms confer substantial benefits on Momentus and Current Momentus Stockholders. *See* Section III, *supra*. These Reforms will help: (i) reduce the chances that Momentus and its stockholders will suffer the consequences of a further loss of investor confidence and legal/regulatory exposure by materially improving the Company's internal controls and oversight regime, public disclosures, and other business practices; (ii) enhance the value of the Company through better management decisions and improve the Company's business prospects; and (iii) ensure investor confidence in the accuracy of the Company's public disclosures, the integrity of its management, and the independence and effectiveness of the Company's corporate governance and Board oversight. Momentus has agreed subject to the terms of the Stipulation to maintain the Reforms for a minimum of four years—a meaningful amount of time intended to ensure the Reforms become embedded in the Company's policies, practices, and corporate culture, thus protecting against discontinuation of these Measures following the four-year period. Stip., § V., ¶ 2.1; *see also, e.g., Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance measures that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

Yet, any evaluation of the benefits of a proposed settlement must be tempered by recognition that any compromise involves concessions by all parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice*, 688 F.2d at 624. "[T]he odds of winning [a] derivative lawsuit [a]re extremely small." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Cohn*, 375 F. Supp. 2d at 852; *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973). Demand futility under Delaware law presents a significant pleadings-stage hurdle for derivative plaintiffs. *See* Delaware Chancery Court Rules, Rule 23.1 ("The complaint shall … allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors … and the reasons for the plaintiff's

1    failure to obtain the action or for not making the effort.”); *Kamen v. Kemper Fin. Servs. Inc.*, 500

2    U.S. 90, 96 (1991) (demand futility is satisfied only under “‘extraordinary conditions’”).

3        The plaintiffs who made the Litigation Demands on Momentus’s Board here faced an even

4    tougher road than pleading demand futility.  *See, e.g., Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del.

5    1990) (where demand is made, courts apply business judgment presumption that, in responding, the

6    directors “acted on an informed basis, in good faith and in the honest belief that the action taken

7    was in the best interests of the company”); *Levine v. Smith*, 591 A.2d 194, 211-13 (Del. 1991),

8    overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (litigation demands

9    concede board’s independence and disinterestedness); *Norfolk Cty. Ret. Sys. v. Jos. A. Bank*

10   *Clothiers, Inc.*, No. CIV.A. 3443-VCP, 2009 WL 353746, at *7 n.51 (Del. Ch. Feb. 12, 2009)

11   (“Demonstrating wrongful refusal is more daunting than demonstrating demand futility.”).  Under

12   Delaware law, even a conflicted board can wrest control of a derivative claim from a stockholder

13   by establishing a committee of independent directors to investigate the claim and determine whether

14   to prosecute it.  *See Zapata*, 430 A.2d at 786 (“We do not think that the interest taint of the board

15   majority is *per se* a legal bar to the delegation of the board’s power to an independent committee

16   composed of disinterested board members.  The committee can properly act for the corporation to

17   move to dismiss derivative litigation that is believed to be detrimental to the corporation’s best

18   interest.”)

19       Even if Plaintiffs were able to survive the pleading stage, Plaintiffs would need to secure

20   evidence sufficient to overcome motions for summary judgment predicated on the “business

21   judgment rule,” which affords directors the presumption that they acted on an informed basis and

22   in the good faith belief that their actions taken were in the best interest of the company, *see, e.g., In*

23   *re Walt Disney Company Derivative Litigation*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff’d*, 906

24   A.2d 27 (Del. 2006), and the exculpation and indemnification rights granted to directors, absent a

25   demonstration of intentional misconduct and disloyalty.  *See* 8 Del. C. §102(b)(7) (corporations may

26   exculpate directors from personal liability for damages except where they fail to act in good faith).

27       While Plaintiffs believe their claims have merit, the fact is certain claims against the

28   directors center on alleged oversight failures, which may be “the most difficult theory in corporation

law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Moreover, the discovery required before trial would be exceedingly costly, complex, and time-consuming, as it would encompass an enormous volume of additional documents, depositions of myriad fact witnesses, and preparation of expert reports and depositions of experts concerning subjects unique to this derivative litigation.[9]

The Settlement eliminates the foregoing and other risks and costs of continued litigation, including the risk of no recovery for Momentus, and it permits the Company to return its full attention to its business and to restoring its reputation and generating stockholder value. *See AOL Time Warner*, 2006 WL 2572114, at *5 (S.D.N.Y. Sept. 6, 2006). The substantial benefits of the Settlement, which were only achieved through the Settling Parties' hard-fought negotiations, demonstrate that the Settlement is "fair, reasonable and adequate to all concerned," and "within the range of possible approval." *Officers for Justice*, 688 F.2d at 625; *True*, 2009 WL 838284, at *3.

## VIII. NOTICE TO CURRENT MOMENTUS STOCKHOLDERS

Plaintiff seeks Court approval of the form and manner of the notice of the Settlement to Current Momentus Stockholders set forth in the Stipulation and requests entry of the Preliminary Approval Order substantially in the form of **Exhibit B** to the Stipulation, submitted concurrently herewith, which provides: (i) preliminary approval of the Settlement set forth in the Stipulation; (ii) approval of the method of providing notice of the proposed Settlement to Current Momentus Stockholders; (iii) approval of the form of Notice and Summary Notice attached to the Stipulation

---

[9] The challenges involved in proving damages are equally daunting. *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable."). And even a victory at trial is no guarantee that the judgment would avoid reversal on appeal. *See, e.g., In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (evidence insufficient to support jury verdict for stockholders of $277 million).

as **Exhibits C and D**, respectively; and (iv) a date for the Settlement Hearing. Stip., §V., ¶3.1. Federal Rule of Civil Procedure 23.1 requires "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed R. Civ. P. 23.1(c). The rule provides courts with discretion, to determine the manner for provision of notice. *Maher*, 714 F.2d at 450-51.

The Stipulation provides that within ten days after the Court enters the Preliminary Approval Order, Momentus shall provide notice to Current Momentus Stockholders by causing: (i) issuance of a press release with the Summary Notice on *Business Wire*, *GlobeNewswire*, or similar news wire service; (ii) the posting of the Notice and the Stipulation (including exhibits) on the "Investor Relations" portion of the Company's website, the address of which will be contained in the Notice and Summary Notice and which posting shall be maintained through the date of the Settlement Hearing; and (iii) the filing with the SEC of a Current Report on Form 8-K, attaching the Notice and the Stipulation (including exhibits). Stip., § V., ¶ 3.2.

The proposed Notice describes in plain English the terms and conditions of the proposed Settlement, including: (i) the facts and considerations that led the Settling Parties to conclude that the proposed Settlement is fair, reasonable, adequate, and in Momentus's best interests; (ii) the procedure for objecting to the proposed Settlement; and (iii) the date, place, and time of the Settlement Hearing. Stip., Exhibits C-D. Given that the proposed Notice and Summary Notice are reasonably calculated to apprise Current Momentus Stockholders of the pendency and Settlement and afford them an opportunity to present their objections, if any, the form of the notice program should be approved. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

The proposed manner of notice via publication has gained broad acceptance in light of the rapid transition of the investment community from a paper-based to a web-based disclosure system, and the notice program employed in this Settlement has been widely used in similar shareholder derivative settlements and approved by numerous courts as meeting due process. *See, e.g., In re MRV Commc'ns, Inc. Derivative Litig.*, No. CV 08-03800 GAF MANX, 2013 WL 2897874, at *1

(C.D. Cal. June 6, 2013) (approving notice to absent stockholders by publication in *Investor's Business Daily*, filing with SEC, and posting on company's website); *Arace v. Thompson*, No. 08 CIV. 7905 DC, 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011) (finding that notice published in Investor's Business Daily was legally adequate to place absent stockholders on constructive notice of the settlement); *Moore v. Verb Tech. Co., Inc.*, No. CV 19-8393-GW-MAAX, 2021 WL 11732976, at *7 (C.D. Cal. Mar. 1, 2021) (issuing preliminary approval where notice was published on *GlobeNewswire*).  Accordingly, the Settling Parties respectfully request that the Court approve the form and manner of Notice as set forth in the Stipulation.

## IX.   PROPOSED SCHEDULE OF EVENTS

As part of the Preliminary Approval Order, the Settling Parties request that the Court establish: (i) the deadline for providing notice of the Settlement to Current Momentus Stockholders; (ii) the deadline for Current Momentus Stockholders to object to the Settlement; and (iii) the date of the Settlement Hearing.  Plaintiff proposes the following schedule:

| | |
|---|---|
| Notice and Stipulation (including exhibits thereto) attached to Form 8-K or periodic report filed with the SEC and posted on Momentus's website, and press release with Summary Notice published on *GlobeNewswire* or similar service. | Within 10 days after entry of the Preliminary Approval Order |
| Deadline to file any motions for final approval of the Settlement | At least 35 days before the Settlement Hearing |
| Deadline for the Company's counsel to file a declaration or affidavit confirming compliance with the Notice as approved by the Court | Within 20 days after the entry of the Preliminary Approval Order |
| Deadline for Current Momentus Stockholders to object to the Settlement | At least 28 calendar days before the Settlement Hearing |

| | |
|---|---|
| Deadline for filing any replies to any shareholder objections | At least 14 days before the Settlement Hearing |
| Settlement Hearing | At least 60 calendar days after entry of the Preliminary Approval Order |

This schedule is similar to those used in numerous other shareholder derivative and class action settlements and provides sufficient due process to Current Momentus Stockholders with respect to their rights concerning the proposed Settlement.

## X.    CONCLUSION

The Settlement is an excellent result given the risks inherent in the Derivative Matters and the complexity and expense if the Derivative Matters were to proceed.  Thus, the Settlement is "within the range" of what may be approved as fair, reasonable, and adequate, and Plaintiff respectfully submits it should be preliminarily approved.

*/s/ Brett M. Middleton*
Brett M. Middleton
Frank J. Johnson
Jonathan M. Scott
**JOHNSON FISTEL, LLP**
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Email: brettm@johnsonfistel.com
        frankj@johnsonfistel.com
        jonathans@johnsonfistel.com

*Counsel for Plaintiff Hanna*