1

2

3

4

5

6

7

**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Jonathan M. Scott (SBN 323322)
JonathanS@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063

*Counsel for Plaintiff*

8

9

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| MELISSA HANNA, Derivatively on Behalf of MOMENTUS INC. (F/K/A STABLE ROAD ACQUISITION CORP.),<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN KABOT, JUAN MANUEL QUIROGA, JAMES NORRIS, JAMES HOFMOCKEL, MIKHAIL KOKORICH, DAWN HARMS, FRED KENNEDY, CHRIS HADFIELD, MITCHEL B. KUGLER, VICTORINO MERCADO, KIMBERLEY A. REED, LINDA J. REINERS, JOHN C. ROOD, STABLE ROAD ACQUISITION CORP., and SRC-NI HOLDINGS, LLC,<br><br>Defendants,<br><br>and<br><br>MOMENTUS INC. (F/K/A STABLE ROAD ACQUISITION CORP.),<br><br>Nominal Defendant. | Case No. 5:23-CV-00374<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: November 21, 2024<br>Hearing Time: 9:00 a.m.<br>Courtroom: 4, 5th Floor<br>Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 3

II.   OVERVIEW OF THE DERIVATIVE MATTERS ..................................................... 5

      A.    Factual Background Of Plaintiffs' Claims ................................................ 5

      B.    Procedural History ..................................................................... 6

            1.    The *Hanna* Action ............................................................... 6

            2.    The *Rivlin* Action .............................................................. 8

            3.    The *Lindsey* Action ............................................................. 9

            4.    The Litigation Demand ........................................................... 10

      C.    Settlement Negotiations ................................................................ 10

      D.    Preliminary Approval And Notice To Shareholders ....................................... 11

      E.    Terms And Benefits Of The Settlement .................................................. 11

            1.    Board Refreshment, Independence, And Education ................................... 11

            2.    Improvements To The Management-Level
                  Disclosure Committee And Management's
                  Strategic Update Reports ........................................................ 13

            3.    Management-Level Oversight Enhancements And CCO ................................. 14

III.  THE SETTLEMENT IS FAIR, REASONABLE AND
      ADEQUATE AND SHOULD BE FINALLY APPROVED ............................................... 16

      A.    Legal Standards For Final Approval .................................................... 16

      B.    The Settlement Confers Substantial Benefits To Momentus ............................... 17

      C.    The Risks, Costs And Delays Of Continued Litigation ................................... 19

      D.    The Stage Of The Proceedings ......................................................... 20

      E.    The Settlement Is The Product Of Arm's
            Length Negotiations Led By Experienced Counsel ....................................... 21

IV.   THE SEPARATELY NEGOTIATED AND AGREED-TO FEE
      AND EXPENSE AMOUNT SHOULD BE APPROVED ................................................. 22

      A.    The Fee And Expense Amount Is Fair And
            Reasonable In Light Of The Settling Parties'
            Agreement And The Results Obtained ................................................... 22

i

B.  A Lodestar Cross-Check Supports Approval Of The Fee and Expense Amount ................................................................. 24

C.  The Service Awards Should Be Approved ..................................................... 24

V.  CONCLUSION ......................................................................................................... 25

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Arnaud van der Grach de Gomersal v. Auerbach*,
   2019 WL 7753447 (C.D. Cal. Jan. 7, 2019) ........................................................23

5

*Cohn v. Nelson*,
6   375 F. Supp. 2d 844 (E.D. Mo. 2005)..........................................................18, 22

7

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)...........................................................................22

8

*Feuer v. Thompson*,
9   2013 WL 2950667 (N.D. Cal. June 14, 2013) ...........................................................23

*Hensley v. Eckerhart*,
10   461 U.S. 424 (1983)...................................................................................23

11

*In re Apple Computer, Inc. Deriv. Litig.*,
12   2008 WL 4820784 (N.D. Cal. Nov. 5, 2008)...........................................................20

13

*In re Caremark Int'l Inc. Deriv. Litig.*,
   698 A.2d 959 (Del. Ch. 1996).....................................................................20

14

*In re Cendant Corp., Deriv. Action Litig.*,
15   232 F. Supp. 2d 327 (D.N.J. 2002) .........................................................24

16

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000)....................................................................21, 24

17

*In re NVIDIA Corp. Deriv. Litig.*,
18   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ...........................................16, 17

19

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................17

20

*In re OSI Sys., Inc. Deriv. Litig.*,
21   2017 WL 5642304 (C.D. Cal. May 2, 2017) ...........................................17

22

*In re Pac. Enterprises Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995)....................................................................19

23

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
24   445 F. Supp. 3d 508 (N.D. Cal. 2020) .................................................24

25

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991)..................................................................................20

26

*Maher v. Zapata Corp.*,
27   714 F.2d 436 (5th Cir. 1983)..................................................................22

28

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ............................................................................................17, 22

*Nat'l Rural Telecoms Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................................22

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982)...............................................................................16, 20

*Perlmutter v. Intuitive Surgical, Inc.*,
   2011 WL 566814 (N.D. Cal. Feb. 15, 2011)...............................................................20

*Satchell v. Fed. Express Corp.*,
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ...................................................18, 24

*Sauby v. City of Fargo*,
   2009 WL 2168942 (D.N.D. July 16, 2009)................................................................24

*Spiegel v. Buntrock*,
   571 A.2d 767 (Del. 1990) ............................................................................................19

*Unitrin, Inc. v. Am. Gen. Corp.*,
   651 A.2d 1361 (Del. 1995) ..........................................................................................19

*Villanueva v. Morpho Detection, Inc*,
   2015 WL 4760464 (N.D. Cal. Aug. 12, 2015)...........................................................21

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002)....................................................................................24

**Rules**

Fed. R. Civ. Proc. 23.1 ...............................................................................................1, 16

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Rule 23.1(c) of the Federal Rules of Civil Procedure and the Court's Preliminary Approval Order, As Modified (referred to herein as "ECF No. 39"), Plaintiff Melissa Hanna ("Plaintiff") will and hereby does move this Court, before the Honorable Edward J. Davila, on November 21, 2024, at 9:00 a.m., at the United States District Court, Northern District of California, San Jose Courthouse, Courtroom 4, 5th Floor, 280 South 1st Street, San Jose, California 95113, for entry of an Order: (i) approving the Settlement as fair, reasonable, and adequate; (ii) approving the requested Fee and Expense Amount; (iii) approving the requested Service Awards of $2,000 for each of the Plaintiffs;[1] and (iv) for such other and further relief as the Court deems appropriate (the "Motion").[2]  This Motion is based on: (1) the accompanying Memorandum of Points and Authorities; (2) the Declaration of Brett M. Middleton in Support of Plaintiff's Motion for Final Approval of Settlement and its exhibits; (3) the Stipulation and Agreement of Settlement dated August 26, 2024 (ECF No. 34-2) and its exhibits (ECF Nos. 34-3 through 34-11, inclusive); and (4) all pleadings, proceedings, documents, evidence and arguments the Court may consider in connection.

Plaintiff respectfully requests that the Court find that the Settlement merits final approval and enter a final Judgment in the form attached as Exhibit E to the Stipulation (the Settling Parties' "[Proposed] Final Order and Judgment"), which is also concurrently submitted herein with Plaintiff's Motion papers.

---

[1] "Plaintiffs" refers to Plaintiff Hanna in this action, as well as plaintiffs in related shareholder derivative actions pending in the United States District Court for the Central District of California and the Delaware Court of Chancery, Justin Rivlin, and Brian Lindsey, respectively, and stockholder Kamal Qureshi who served a litigation demand on the Board of Directors of Momentus (these related derivative actions are collectively referred to as the "Derivative Matters").  The Settlement resolves each of the Derivative Matters.

[2] Unless otherwise indicated, all capitalized terms have the same meaning as in the Stipulation.

1      Defendants do not oppose the Motion. [3]

2          **STATEMENT OF ISSUES TO BE DECIDED AND RELIEF SOUGHT**

3          Whether the proposed settlement as set forth in the Stipulation and Agreement of

4      Settlement dated August 26, 2024 (the "Stipulation," or the "Stip.") (ECF No. 34-2, also referred

5      to herein as the "Settlement") is fair, reasonable, and adequate as to each of the Settling Parties,

6      and whether the Fee and Expense Amount and Service Awards are fair and reasonable, and thus

7      should be approved in all respects.  Plaintiff respectfully requests the Court to enter an order and

8      Judgment finally approving the Settlement, Fee and Expense Amount, and Service Awards

9      substantially in the proposed form agreed to between the Settling Parties in Exhibit E to the

10     Stipulation (ECF No. 34-7), which is also concurrently submitted herein with Plaintiff's Motion.

11          **MEMORANDUM OF POINTS AND AUTHORITIES**

12         Plaintiff respectfully submits this memorandum in support of the Motion for Final

13     Approval of Settlement in connection with the above-captioned stockholder derivative action,

14     brought on behalf of Momentus Inc. ("Momentus," or the "Company").  The Settlement will

15     also resolve related Derivative Matters brought by the following Settling Parties: (i) plaintiff

16     Justin Rivlin ("Rivlin") in the action *Rivlin v. Kabot, et al.*, No. 2:23-cv-03120 (C.D. Cal.) (the

17     "*Rivlin* Action"); (ii) plaintiff Brian Lindsey ("Lindsey") in the action captioned *Lindsey v.*

18     _____

19     [3] The term "Defendants" includes defendants named in the Derivative Matters, as set forth in

20     the Stipulation: Brian Kabot ("Kabot"), Juan Manuel Quiroga ("Quiroga"), Edward K.

21     Freedman ("Freedman"), James Norris ("Norris"), Marc Lehmann ("Lehmann"), James

22     Hofmockel ("Hofmockel"), Ann Kono ("Kono"), Dawn Harms ("Harms"), Fred Kennedy

23     ("Kennedy"), Chris Hadfield ("Hadfield"), Mitchel B. Kugler ("Kugler"), Victorino Mercado

24     ("Mercado"), Kimberly A. Reed ("Reed"), Linda J. Reiners ("Reiners"), and John C. Rood

25     ("Rood") (collectively, with defendant Mikhail Kokorich ("Kokorich"), the "Individual

26     Defendants"); (vi) Stable Road Acquisition Corp. ("SRAC") and SRC-NI Holdings LLC (the

27     "Sponsor") (collectively, the "SRAC Defendants"); and (vii) Momentus Inc. (together with the

28     Individual Defendants and the SRAC Defendants, the "Defendants").

*Quiroga, et al.*, No. 2023-0674 (Del. Ch.) ("*Lindsey* Action"); and (iii) stockholder Kamal Qureshi ("Qureshi," and with Plaintiff, Rivlin, and Lindsey, "Plaintiffs") who served a litigation demand ("the Litigation Demand") on the Board of Directors ("Board") of Momentus.

## I.    <u>INTRODUCTION</u>

After much effort on behalf of Momentus, the Settling Parties have reached an agreement that settles the derivative claims brought on behalf of the Company alleged in the Derivative Matters (the "Settlement"). *See* the Declaration of Brett M. Middleton in Support of Plaintiff's Motion for Final Approval of Settlement, filed concurrently herewith ("Middleton Decl."), ¶5. The Settlement represents an excellent resolution for Momentus of a highly complex case involving alleged misrepresentations made, *inter alia*, in proxy solicitations in violation of §14(a) of the Securities and Exchange Act (the "Exchange Act"), breaches of fiduciary duties and related misconduct that began in October 2020, at least, and continued after the merger between Stable Road Acquisition Corporation, which operated as a special acquisition company ("SPAC") at the time, and Momentus's legacy business ("Legacy Momentus"), which was consummated on August 12, 2021 (the "Merger"). *See* Stip., §I.A.

The Settlement is the product and culmination of hard fought, arm's-length negotiations by experienced and well-informed counsel, with the assistance of Jed D. Melnick, Esq. of JAMS ADR (the "Mediator"), a nationally recognized mediator with extensive experience mediating shareholder derivative actions. Middleton Decl., **<u>Exhibit 1</u>** (Declaration of Jed D. Melnick in Support of Settlement ("Melnick Decl."), ¶¶4, 11). The Settlement is also supported by the independent members of the Board to be in the Company's best interests, and fair and reasonable. Stip., §IV. It provides valuable changes to Momentus's disclosure controls, risk management, oversight practices, Board independence, compliance policies, and governance (the "Reforms") that are tailored to address the allegations in the Derivative Matters, and that generally provide valuable improvements to the Company's policies, procedures and governance practices. Middleton Decl., ¶30.

Specifically, in consideration for the Settlement, Momentus shall adopt, implement and maintain the Reforms for a period of at least four (4) years, which include the: (i) creation of a

new Chief Compliance Officer position, with enumerated duties; (ii) appointment of a new independent director and general enhancements to Board independence; (iii) expansion of the role of the management-level Disclosure Committee; (iv) requirement for new reporting and oversight requirements between Board members and management, including significant changes to Momentus's risk management framework; (v) new training requirements for directors and management; and (vi) a new Clawback Policy. *See* Stip., Exhibit A, at I.A–I.M. Momentus has acknowledged that the Reforms provide substantial benefits to the Company and its stockholders, and that the Derivative Matters were a material cause of the Board's decision to adopt, implement, and maintain the Reforms. *See* Stip., §V, ¶¶2.2–2.3, 5.1.

On September 16, 2024, the Court granted preliminary approval of the Settlement, as modified, finding that "the proposed Settlement falls within the range of possible approval criteria, as it provides a beneficial result for Momentus and appears to be the product of serious, informed, non-collusive negotiations overseen by an experienced mediator[.]" ECF No. 39, p. 2.

Plaintiffs negotiated and obtained an agreement from the Company to adopt these Reforms despite facing risks establishing liability and damages. Stip., §II. In recognition of the substantial benefits achieved for Momentus due to Plaintiffs' Counsel's efforts, and with the Mediator's aid after the Settling Parties agreed in principle to the substantive consideration, the Company's directors' and officers' insurers agreed to pay Plaintiffs' Counsel attorneys' fees and expenses in the total amount of $300,000, subject to Court approval. The Fee and Expense Amount is a small fraction of the value of the Settlement's benefits to Momentus and warrants the deference traditionally accorded such arm's-length agreements among sophisticated parties. Plaintiffs also seek approval of a $2,000 Service Award for each of the four Plaintiffs in the Derivative Matters, to be paid out of the Fee and Expense Amount. Stip., §V, ¶5.9.

For all of the reasons discussed herein, Plaintiff respectfully requests that the Court: (1) finally approve the Settlement, the separately negotiated Fee and Expense Amount, and the modest Service Awards to Plaintiffs, and (2) enter the Proposed Order and Final Judgment.

## II.    OVERVIEW OF THE DERIVATIVE MATTERS[4]

### A.    Factual Background Of Plaintiffs' Claims

Momentus is a Delaware corporation headquartered in San Jose, California, that presently operates as a commercial space company that offers satellites, satellite buses, and other satellite components, transportation and infrastructure services, including hosted payloads and other in-orbit services, to enable the commercialization of space. Stip., §I.A.; *see also* ¶2.[5]  The Company claimed that it intended "to use a multi-pronged approach to become a provider of three critical functions in the new space economy: Space Transportation, Satellite as a Service, and In-Orbit Servicing."  *Id*.  Before the Merger, the Company operated as a SPAC, known as Stable Road Acquisition Corporation ("SRAC"), aimed at finding and acquiring a cannabis company, and had 18 months to accomplish its goal.  ¶¶4, 34.  On October 7, 2020, SRAC and Legacy Momentus, a purported space business, announced they had entered into a merger agreement in which SRAC stockholders would gain a proportionate interest in the post-Merger Momentus, and Momentus would gain access to $172.5 million in revenue from SRAC's initial public offering in November 2019, resulting in Legacy Momentus' business operations becoming the public Company's operations.  ¶38.

---

[4] The Defendants deny any and all allegations of wrongdoing or liability with respect to the claims asserted in the Derivative Matters, including without limitation that they breached their fiduciary duties or any other duty owed to the Company or its stockholders or that they aided and abetted others in breach of such duties.  The Defendants further assert that at all relevant times, they acted in good faith and in a manner that they reasonably believed to be in the best interests of the Company and its stockholders, and diligently and scrupulously complied with any applicable fiduciary duties.  Defendants also contend that Plaintiffs have not alleged sufficient facts to establish that they may maintain their derivative claims, either by failing to plead demand futility or failing to plead that demand was wrongfully refused.  Stip., §III.

5  Unless otherwise noted, all references to "¶__" or "¶¶__" are to the Verified Shareholder Derivative Complaint filed by Plaintiff in the *Hanna* Action on January 25, 2023 (ECF No. 1.).

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

Plaintiffs allege that, beginning in at least October 2020, the Individual Defendants caused the Company to engage in a pattern of deceptive disclosures to artificially inflate the Company's reported financial performance.    ¶187.    Among other things, the Individual Defendants allegedly failed to disclose to investors that: (i) the federal government had determined that Defendant Kokorich was a threat to national security; (ii) Momentus had never successfully tested its technology in space; (iii) the projections of Momentus's future revenues were grossly overstated; and (iv) the Company failed to maintain proper policies, procedures, and controls to protect Momentus from harm caused by the issuance of false and misleading statements.   ¶¶70, 165.   The Derivative Matters also allege that SRAC overpaid significantly for acquiring Legacy Momentus and that certain Defendants improperly solicited and received material undue benefits from the proxy solicitation issued in connection with the Merger to the Company's detriment.   Stip., §I.A.

As a result of the alleged mismanagement, self-dealing, and wrongdoing, Momentus suffered significant harm.   Plaintiffs allege that the alleged misconduct exposed Momentus to liability in the consolidated federal securities class action brought in the United States District Court for the Central District of California, captioned *In re Stable Road Acquisition Corp. Sec. Litig.*, No. 2:21-cv-05744 (the "Securities Class Action"), which settled on August 18, 2023, for $8.5 million.   ¶¶8, 92; Stip., §I.A.   The Company also became the subject of an action by the U.S. Securities and Exchange Commission ("SEC"), along with the Sponsor, Kabot, and Kokorich (the "SEC Action").   ¶6.   All parties apart from Kokorich settled the SEC Action, with the settlement terms including more than $8 million in penalties.   *Id.*

### B.    Procedural History

#### 1.    The *Hanna* Action

On August 16, 2022, Plaintiff Hanna made a formal litigation demand ("Demand") to the Board where she demanded that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into the Individual Defendants' alleged violations of Delaware and federal law; and (ii) if warranted, commence a civil action against the Individual Defendants (and any others who may be similarly liable for breach of fiduciary duty of care,

breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Individual Defendants) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their alleged breaches of fiduciary duties, as well as take additional affirmative action to redress the wrongdoing and mismanagement and prevent such wrongdoing from occurring again in the future.  Stip., §I.B.1.

The Demand further alleges that the Individual Defendants violated their core fiduciary duty obligations during the relevant period defined therein through their alleged wrongful conduct, in the Securities Class Action, and the SEC Action.  Plaintiff Hanna further demanded: (i) the Board require the directors and officers to account to the Company for all damages sustained, or to be sustained, by the alleged wrongful conduct and mismanagement, and make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action or in the SEC Action; (ii) the Board seek remuneration from certain officers and directors of whatever kind paid to them during the time they were in breach of their fiduciary duties; (iii) the Board require the directors and officers to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct; and (iv) the Board adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the alleged wrongful conduct and mismanagement is not permitted to occur in the future.  *Id*.  For several months, the Board deferred investigating the alleged wrongdoing identified in the Demand. Accordingly, on January 25, 2023, Plaintiff Hanna filed a lawsuit in the United States District Court for the Northern District of California.  *See* ECF No. 1.[6]

On April 12, 2023, the parties to the *Hanna* Action stipulated to stay the *Hanna* Action until August 4, 2023, which the court ordered on April 19, 2023.  ECF No. 16.  On August 18, 2023, the parties to the *Hanna* Action stipulated to continue the stay pending the outcome of the mediation, ECF No. 17, which was ordered by the court on August 21, 2023.

---

[6]  References to "ECF No. __" refer to filings on the docket in the *Hanna* Action; "Rivlin ECF No. __" refer to filings on the docket in the *Rivlin* Action.

1    ECF No. 18.  The parties further stipulated to extend the stay in November 2023 and

2    January 2024.  *See* ECF Nos. 19–20, 22–23; Stip., §I.B.1.  Following this, the parties to the

3    *Hanna* Action filed status reports with the court informing the court about the progress of

4    settlement negotiations.  *See* ECF Nos. 24, 26, 28, 30.  The court set a date for a status conference

5    regarding settlement on September 5, 2024, and ordered the parties to file a joint status report

6    regarding the status of settlement by August 23, 2024.  ECF No. 31.  Stip., §I.B.1.

7    **2.**    **The *Rivlin* Action**

8    On April 25, 2023, Plaintiff Rivlin initiated a derivative action on the Company's behalf

9    against a subset of the Individual Defendants in the United States District Court for the Central

10   District of California.  Rivlin ECF No. 1.  The *Rivlin* Action alleges that the defendants violated

11   §14(a) of the Exchange Act, breached their fiduciary duties, including by enabling SRAC to

12   overpay for its acquisition of Legacy Momentus, and/or engaged in related additional

13   misconduct between October 7, 2020, and November 22, 2022, and pleads that demand on the

14   Board would have been futile and is thus, excused.  *See* Rivlin ECF No. 1; Stip., §I.B.2.

15   The *Rivlin* Action alleges that certain Individual Defendants and the Sponsor unjustly

16   materially benefited from hundreds of thousands of dollars' worth of stock grants provided to

17   them under the 2021 equity incentive plan, which was solicited and approved by way of the false

18   and misleading Merger Proxy.  These awards allegedly provided certain of the director

19   defendants with the financial motivation to allow the underlying misconduct to occur, and

20   further conflicted them from considering any demand to act against the individuals that

21   facilitated the schemes.  The stock awards challenged in the *Rivlin* Action were double to even

22   ten times more than the value of fees paid, or cash earned for mere director services in some

23   cases.  *Id*.

24   The *Rivlin* Action also alleges breach of fiduciary duty claims that raise a federal

25   question based on claims made in the Securities Class Action for making false and misleading

26   statements and omissions in violation of the federal securities laws and seeks contribution under

27   §10(b) and 21D of the Exchange Act against the Sponsor and Defendants Kabot, Kokorich,

28   Harms, and Kennedy.  Rivlin ECF No. 1.

1    On July 14, 2023, these defendants filed motions to dismiss (Rivlin ECF No. 19), and

2    Plaintiff responded by filing a Verified Amended Shareholder Derivative Complaint, in which

3    it named additional Individual Defendants and the Sponsor as defendants.  Rivlin ECF No. 28.

4    The parties then stipulated to extend the defendants' deadlines to respond to the amended

5    complaint to allow the parties to engage in good faith settlement negotiations by way of

6    mediation.  Rivlin ECF Nos. 34–35.  Following this, the parties vacated all deadlines for the

7    *Rivlin* Action and submitted status reports to the Court regarding the status of the settlement

8    negotiations.  Rivlin ECF Nos. 46–48, 50, 53–54.  Stip., §I.B.2.

9                    **3.      The *Lindsey* Action**

10    On October 28, 2022, Plaintiff Lindsey made a formal demand on the Board to

11    investigate and commence legal proceedings against certain directors, executive officers and

12    agents of the Company.  Counsel to the Board responded to Plaintiff Lindsey's demand in an

13    email on November 10, 2022, stating that the Board was reviewing the demand and would

14    provide a response shortly.  Stip., §I.B.3.

15    On January 20, 2023, the Board's counsel sent Plaintiff Lindsey's counsel a letter,

16    stating: "Given the time that remains before expiration of the applicable statutes of limitations,

17    as well as the similarity between the Haenisch/Shirley Matters and the litigation proposed in

18    your previous correspondence, the Company defers resolution of your request as it considers the

19    propriety of forming a demand review committee to evaluate all shareholder demands asserted

20    against the Company and the Company's rights and potential claims to vindicate the best

21    interests of the Company."  *Id*.  After five more months passed, Plaintiff Lindsey considered the

22    Board's refusal to enter into a tolling agreement with the Individual Defendants and failure to

23    respond to his demand as more delay and as a *de facto* refusal to act upon his demand.

24    Accordingly, Plaintiff Lindsey filed his demand refused derivative action in Delaware Chancery

25    Court on June 30, 2023.  Stip., §I.B.3.

26    On July 24, 2023, the parties to the *Lindsey* Action stipulated to extend time for the

27    defendants to move or otherwise respond to Plaintiff Lindsey's complaint, which was granted

28    on July 25, 2023.  The court further extended the time for defendants to move or otherwise

1  respond to the complaint on September 20, 2023, and November 20, 2023.  Stip., §I.B.3.

2        On January 18, 2024, after settlement negotiations between the parties, the court vacated

3  the deadline for the defendants to respond to Plaintiff Lindsey's complaint, and ordered the

4  parties to either submit a status report regarding settlement negotiations or submit a stipulation

5  of settlement and motion papers.  The parties to the *Lindsey* Action filed status reports to the

6  court informing it of the status of settlement negotiations on February 16, 2024, March 18, 2024,

7  and May 17, 2024.  Stip., §I.B.3.

8              **4.    The Litigation Demand**

9        On February 21, 2023, counsel for Plaintiff Hanna sent the Board a letter informing it

10  that another Momentus stockholder, Qureshi, reviewed Plaintiff Hanna's Demand and was

11  formally joining it in its entirety, as if it was originally served on his behalf.  Hanna and Qureshi

12  both previously served books and records demands pursuant to 8 *Del. C*. §220, entered into

13  mutually agreed upon confidentiality agreements, and received documents from the Company.

14  Counsel for the Board acknowledged Qureshi's joinder to the Demand in a letter sent to Plaintiff

15  Hanna's and Qureshi's counsel on March 1, 2023, but failed to provide Qureshi any substantive

16  updates regarding any investigation of the allegations made in the Demand.  Stip., §I.B.4.

17        **C.    Settlement Negotiations**

18        On October 25, 2023, the Settling Parties attended a full day mediation (the "Mediation")

19  with the Mediator.  *See* Stip., §I.C.  In advance of the Mediation, Plaintiffs Hanna and Lindsey

20  submitted detailed settlement demands to Defendants.  *See id*.  Although the October 25, 2023,

21  Mediation ended without a settlement, the Parties made meaningful progress and thereafter

22  continued their settlement negotiations, with the Mediator's assistance.  *See id*.

23        Detailed written proposals and counter-proposals were exchanged and debated in

24  numerous communications over the next several months.  On February 14, 2024, the Parties

25  reached an agreement in principle on the corporate governance Reforms that will be adopted by

26  Momentus as consideration for a global resolution of the Derivative Matters.  *See id*.

27        As set forth, after the Settling Parties reached an agreement in principle on the material

28  substantive terms to resolve the Derivative Matters, Plaintiffs' Counsel and Defendants' Counsel

1   negotiated an appropriate award of attorneys' fees and expenses with the aid and supervision of

2   the Mediator.  *See id*.  Following a number of exchanges through the Mediator, Defendants

3   agreed not to oppose Plaintiffs' proposed Fee and Expense Amount of $300,000, subject to

4   Court approval.  *See id*.  Thereafter, the Settling Parties negotiated and finalized the formal

5   operative terms of the Settlement as set forth in the Stipulation.  *See id*.

### D.   Preliminary Approval And Notice To Shareholders

7   On September 16, 2024, this Court granted preliminary approval of the Settlement, and

8   entered the Preliminary Approval Order, as modified.  *See* ECF No. 39.  This Court otherwise

9   authorized notice of the proposed Settlement to Current Momentus Stockholders, and set a

10   Settlement Hearing for November 21, 2024, at 9:00 a.m.  *Id*., ¶2.

11   In accordance with the Preliminary Approval Order, the Notice was filed with the SEC

12   via Form 8-K on September 26, 2024, and posted on the Company's website along with the

13   Stipulation and its exhibits.  The Company issued a press release and published the Summary

14   Notice on *BusinessWire* on September 26, 2024, announcing the Settlement.  ECF No. 40  The

15   deadline for filing objections to the Settlement is October 24, 2024.  ECF No. 39, ¶9.

### E.   Terms And Benefits Of The Settlement

17   Plaintiffs alleged that ineffective Board oversight, lax internal reporting practices, and

18   weak controls at the management level allowed management to allegedly misstate and fail to

19   issue accurate disclosures regarding the Merger, Legacy Momentus, and material information

20   about the Company's business, prospects, and exposure.  *See* Stip., §I.A.  The intent behind the

21   Reforms is to address these alleged corporate governance concerns by improving the Board's

22   independence and oversight of critical initiatives, risks, and disclosures, by enhancing training,

23   monitoring and reporting by the Management-level Disclosure Committee, the Board, and key

24   management personnel in order for oversight to be continuous, fully informed, and effective and

25   by providing additional policies and positions to facilitate compliance.

### 1.   Board Refreshment, Independence, And Education

27   In connection with the Settlement, Momentus has agreed to enhance the Board's

28   independence, training for directors and management, and reporting between management and

the Board, ensuring that Momentus remains diligent about compliance and risk management at all levels.  Importantly, as part of the Settlement, Momentus shall nominate one entirely new director, who is independent, for approval by the stockholders upon the attainment of the Additional Director Financial Benchmark.  Momentus acknowledges that the Derivative Matters were a material cause underlying this Reform and all of the Reforms, summarized herein and set forth in full in Exhibit A to the Stipulation.  Stip., Exhibit A, at I.H; Stip., §V, ¶2.2.

The Company has agreed that at least 70% of the Board will continuously be composed of members that meet the independence standards of NASDAQ Stock Exchange and will limit the number of outside committee or director engagements they have in addition to serving Momentus.  Stip., Exhibit A, at I.E and I.I.

Within one (1) year after the Settlement (and six months of joining the Board for new directors) each member of the Board shall receive training focused on the Company's business and industry, committee roles and responsibilities, and legal and ethical responsibilities of directors, including rules and regulations regarding public disclosures, GAAP, the Sarbanes-Oxley Act of 2002, standards governing internal controls over financial reporting, and reporting requirements for public-traded corporations.  Stip., Exhibit A, at I.J.  This training shall include continuing education courses from the National Association of Corporate Directors, Stanford Law School Directors' College, Vanderbilt Directors' College, Dartmouth Tuck School, or similar programs.  *Id*.

Further, the Board's oversight and risk management duties shall be enhanced by requiring, *inter alia*, that it oversee: (i) the identification and monitoring of material risks relating to Momentus's compliance with all applicable laws and regulations and public disclosures (including all SEC filings) about Momentus's business affairs, financial reporting, and risk exposure and whenever any material risks are identified, consider actions for mitigating and disclosing these risks; (ii) the Compensation Committee to assess on an annual basis the Chief Executive Officer's and Chief Financial Officer's contribution to Momentus's culture of ethics and compliance and their effectiveness and dedication to ensuring Momentus's compliance with applicable laws, rules, and regulations; (iii) risks relating to Momentus's dissemination of

1   information regarding product or technology development and progress; and (iv) risks relating

2   to contracts and relationships with material third-party original equipment manufacturers and

3   vendors.  Stip., Exhibit A, at I.A.

4          The Board will now also receive annual reviews from management regarding the

5   effectiveness of Momentus's internal controls over legal and regulatory compliance.  *Id*.

6   Moreover, the Chief Legal Officer or Chief Compliance Officer shall specifically update the

7   Board at each regular quarterly Board meeting regarding: (i) any material violations by the

8   Company that are raised by the SEC, DOJ, or other regulatory agencies that fall under their

9   respective purviews; and (ii) any material adverse developments or significant new information

10  relating to technology or product testing that would potentially change the scope of product

11  development, manufacturing, marketing and sales.  Stip., Exhibit A, at I.B.  The Chief Legal

12  Officer and Chief Compliance Officer shall also meet with the independent members of the

13  Board in executive sessions to review any concerns identified by the Company or material

14  compliance issues raised by the SEC, DOJ, or other regulatory agencies.  *Id*.

15         Finally, Board materials will now be sent to Board members at least a week prior to any

16  Board meeting, or as far in advance as possible if a week prior is impractical.  Momentus shall

17  also impose additional limitations on director and committee engagements outside the Company,

18  including requiring that: (i) the chair of the Company's Audit Committee not serve as the chair

19  of the Company's Compensation Committee, and vice versa; (ii) no director, without approval

20  by the Board, may serve on more than two other public companies' boards of directors; and

21  (iii) the Company's Chief Executive Officer may not simultaneously serve as chairman of the

22  board of another public company.  Lastly, all directors shall attend the Company's annual

23  meeting of stockholders, either "virtually" (*i.e.*, online) or in person, absent any extraordinary

24  circumstances limiting their attendance.  Stip., Exhibit A, at I.F.

25         **2.     Improvements To The Management-Level Disclosure
               Committee And Management's Strategic Update Reports**

26

27         The Settlement provides for improvements to the Board's supervisory responsibilities

28  and protocols and enhanced management-level support in critical areas, as set forth below.

For example, Momentus's Management-level Disclosure Committee (the "Management Committee") shall be now explicitly prioritize: (i) the accuracy of any material information disseminated through corporate disclosure channels to investors; (ii) truthful and accurate filings with the SEC; and (iii) adequate internal controls concerning the Company's audited financial statements. Stip., Exhibit A, at I.K. Momentus will also develop a Charter for the Management Committee and post it on Momentus's website. The Management Committee shall now be responsible for creating and implementing controls and policies to regulate both regular and interim public disclosures to stockholders, including within Company SEC filings and non-SEC platforms. The Management Committee shall also be required to provide additional certification to the Certifying Officers before filing each SEC Periodic Report as to: (i) compliance with the Company's Disclosure Policy and the new Charter; and (ii) conclusions resulting from its evaluation of the effectiveness of disclosure controls. *Id.*

At least annually, the Board shall receive a strategic operating plan (the "Strategic Operating Plan") from management concerning: (a) potential material strategic alternatives; (b) an evaluation and the progress of prior strategic operating plan(s) and related initiatives; (c) a review of acquisition, sale, spin-off, and/or investment strategies; and (d) following any material acquisition, sale, spin-off, or investment, a review of the status of the integration of the business units and/or products materially impacted by such transaction. Stip., Exhibit A, at I.C. The Board shall review and discuss the Strategic Operating Plan with management and document its consideration of such matters in the Board's minutes. *Id.*

The Board shall further adopt a Clawback Policy providing that the Company may reduce or recoup the value of incentives awarded to certain company personnel for achieving financial objectives while failing to comply with laws and regulations or failing to adhere to the Company's Code of Business Conduct & Ethics. Stip., Exhibit A, at I.G. Momentus will disclose the specific protocol used to determine whether its Clawback Policy has been triggered (*i.e.*, who reviews this, how often, and which decision-making process was used, etc.). *Id.*

### 3. Management-Level Oversight Enhancements And CCO

The Settlement also provides further enhancements to the Management Committee, by

1  requiring it to now select key members of management, including key gatekeepers in the internal

2  control processes, such as those with approval authority or certification responsibilities, to

3  receive training on the Company's Corporate Governance Guidelines, Code of Business

4  Conduct, Supplemental Code of Business Conduct and Ethics, and Best-in-Class Practices

5  within one (1) year after the settlement, and from time to time thereafter as the Management

6  Committee determines. *See* Stip., Exhibit A, at I.L.

7      The CCO will formally be tasked with managing Momentus's ethics and compliance

8  program and for assisting the Board in overseeing the Company's compliance with applicable

9  laws, regulations, and accounting standards, and disseminating true and accurate information.

10 *See* Stip., Exhibit A, at I.M.   The CCO shall also serve on the Company's Management

11 Committee and shall: (a) oversee and administer the Company's corporate governance policies;

12 (b) work with the Management Committee, Audit Committee, and Disclosure Committee to

13 evaluate and define the goals of the Company's ethics and compliance program in light of trends

14 and changes in laws which may affect the Company's compliance with laws relating to

15 disclosure of the Company's risk exposure; (c) manage and oversee Momentus's ethics and

16 compliance program and implement procedures for monitoring and evaluating the program's

17 performance; (d) review Momentus's draft quarterly and annual reports to be filed with the SEC

18 and drafts of earnings press releases or other earnings materials, and, if requested, confer with

19 the Management Committee, Disclosure Committee, or Audit Committee regarding the contents

20 of such disclosures; (e) oversee employee training in risk assessment and compliance;

21 (f) promptly report to the Audit Committee any significant compliance and ethics issues or

22 concerns, including but not limited to any significant allegations of financial fraud or disclosure

23 and/or reporting violations; and (g) work with the Company's Chief Legal Officer, outside legal

24 counsel, and the Disclosure Committee to evaluate the adequacy of the Company's internal

25 controls over compliance and developing proposals for improving these controls. *Id*.

26     The independent directors on the Board shall approve a resolution reflecting its

27 determination, in a good faith exercise of its business judgment, that the Settlement is fair,

28 reasonable, and in the Company's and its stockholders' best interests, and it confers substantial

1  benefits upon the Company and its stockholders, particularly through the Reforms.  Stip., §IV.

2  **III.    THE SETTLEMENT IS FAIR, REASONABLE AND**
   **ADEQUATE AND SHOULD BE FINALLY APPROVED**

3

4  **A.    Legal Standards For Final Approval**

5       Federal Rule of Civil Procedure 23.1 governs a district court's analysis of the fairness of

6  a settlement of a stockholder derivative action.  Under Rule 23.1, a derivative action "may be

7  settled, voluntarily dismissed, or compromised only with the court's approval.  In determining

8  whether to approve a settlement, "the court's intrusion upon what is otherwise a private

9  consensual agreement negotiated between the parties to a lawsuit must be limited to the extent

10 necessary to reach a reasoned judgment that the agreement is not the product of fraud or

11 overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as

12 a whole, is fair, reasonable and adequate to all concerned."  *Officers for Just. v. Civ. Serv.*

13 *Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  "There is a strong

14 policy favoring compromises that resolve litigation, and case law in the Ninth Circuit reflects

15 that strong policy."  *In re NVIDIA Corp. Deriv. Litig.*, 2008 WL 5382544, at *2 (N.D. Cal.

16 Dec. 22, 2008).  This policy is especially true in the context of stockholder derivative actions,

17 which are "notoriously difficult and unpredictable" and where "settlements are favored."  Notice

18 of a proposed settlement, voluntary dismissal, or compromise must be given to stockholders or

19 members in the manner that the court orders."  Fed. R. Civ. P. 23.1(c).

20       In determining whether a settlement is fair, reasonable, and adequate, courts consider the

21 following factors: (i) the benefits conferred on the corporation; (ii) the risks, costs, and delays

22 of continued litigation; (iii) the stage of proceedings; (iv) whether the settlement is the product

23 of arm's-length negotiations by experienced counsel; and (v) the reaction of shareholders to the

24 proposed settlement.[7]  *See Officers for Just.*, 688 F.2d at 625.  As discussed below, each of these

25

26 _____

27 [7] Current Momentus Stockholders have until October 24, 2024, to object to the Settlement, Fee
   and Expense Amount, and/or Service Awards.  To date, Plaintiffs' Counsel have not received

28

1    factors supports final approval of the Settlement.

2    **B.    The Settlement Confers Substantial Benefits To Momentus**

3    "The principal factor to be considered in determining the fairness of a settlement

4    concluding a shareholders' derivative action *is the extent of the benefit to be derived from the*

5    *proposed settlement by the corporation, the real party in interest*." *In re OSI Sys., Inc. Deriv.*

6    *Litig.*, 2017 WL 5642304, at *2 (C.D. Cal. May 2, 2017). "[S]trong corporate governance is

7    fundamental to the economic well-being and success of a corporation[,]" and corporate

8    governance reforms designed to prevent recurrence of alleged wrongdoing, "provide valuable

9    benefits to public companies." *NVIDIA*, 2008 WL 5382544, at *3. In analyzing whether the

10    benefit achieved is "substantial" enough to support a settlement, the Court should consider

11    whether the relief is "something more than technical in its consequence and . . . that [it]

12    accomplishes a result which corrects or prevents an abuse which would be prejudicial to the

13    rights and interests of the corporation or affect the enjoyment or protection of an essential right

14    to the stockholder's interest." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970). Here, the

15    Reforms are tailored to directly address the wrongdoing allegations underlying the Derivative

16    Matters. Middleton Decl., ¶45. Accordingly, they provide substantial benefits to Momentus

17    because they are intended to reduce the recurrence of the alleged corporate misconduct and

18    governance gaps in the future and bolster investor confidence.

19    The Reforms are intended to create a system of checks and balances between

20    management and the Board, in particular, that should significantly improve the efficacy of

21    Momentus's   disclosures   and   related   controls,   operational   decision-making,   Board

22    _____

23    any objections. Middleton Decl., ¶¶29, 64. The lack of objections weighs in favor of approval

24    of the Settlement. *See, e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 n.7 (N.D.

25    Cal. 2008) (three objections out of tens of thousands of shareholders "raises a strong

26    presumption that the terms of a proposed class settlement action are favorable to the class

27    members"). Plaintiff will address objections, if any, in her reply papers, to be filed on

28    November 7, 2024.

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

independence, education, legal and governance compliance and risk oversight. They also require the nomination of a new independent director and provide the CCO with critical oversight and reporting responsibilities. The new oversight, reporting requirements and enhancements to management-level positions and committees responsible for Momentus's strategy, compliance and disclosures, together with an independent and committed Board, and compliance-centric policies are intended to ensure collaboration and coordination between all levels of Company leadership, which, over a period of four years at least, provide for meaningful lasting change to Momentus. Stip., Exhibit A; *see* Middleton Decl., ¶¶30–44. *Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (even a lesser, three-year duration will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

These Reforms are intended to help: (i) reduce the chances that Momentus and its stockholders will suffer the consequences of a further loss of investor confidence and legal/regulatory exposure by materially improving the Company's internal controls and oversight regime, public disclosures, and other business practices; (ii) enhance the value of the Company through better management decisions and improve the Company's business prospects; and (iii) ensure investor confidence in the accuracy of the Company's public disclosures, the integrity of its management, and the independence and effectiveness of the Company's corporate governance and Board oversight. Middleton Decl., ¶¶45, 47.

The Reforms were negotiated with the assistance of a highly experienced Mediator and "the negotiations were extremely vigorous, completely at arm's length, and fully conducted in good faith.". Melnick Decl., ¶¶1-3, 8. Further, the "Settlement was a result of true arm's-length bargaining." *Id*., ¶11; *see Satchell v. Fed. Express Corp.*, 2007 WL 1114010 at *4 (N.D. Cal. Apr. 13, 2007) (Illston, J.) ("[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive").

After considering the terms of the Settlement and exercising their business judgment to approve it, the independent members of the Board determined that the Settlement, including the Reforms "confers substantial benefits upon the Company and its stockholders." Stip., §IV, ¶2.3. Momentus also acknowledged and agreed that the Reforms benefit the Company and its

1  stockholders and constitute fair, reasonable and adequate consideration for Plaintiffs' release of

2  the derivative claims.  *Id.  See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995)

3  ("[C]ourts will not substitute their business judgment for that of the directors, but will determine

4  if the directors' decision was, on balance, within a range of reasonableness").

5      Finally, this Court reviewed the Reforms in advance of granting preliminary approval

6  and concluded that "upon a preliminary evaluation, that the proposed Settlement falls within the

7  range of possible approval criteria, as it provides a beneficial result for Momentus and appears

8  to be the product of serious, informed, non-collusive negotiations overseen by an experienced

9  mediator[.]"  ECF No. 39, p. 2.

10     In sum, the Settlement confers substantial and lasting benefits to Momentus and is an

11  excellent resolution for the Company in a complex case.

12  **C.      The Risks, Costs And Delays Of Continued Litigation**

13     The Ninth Circuit observed in affirming the district court's approval of a derivative

14  settlement, "the odds of winning [a] derivative lawsuit [are] extremely small" because

15  "derivative lawsuits are rarely successful."  *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378

16  (9th Cir. 1995).  The *Hanna* Action as well as the other Derivative Matters are no different.

17     Weighed against the substantial risk that continued litigation would yield no benefit, the

18  Settlement's guaranteed and immediate benefits are plainly fair, reasonable, and adequate.

19  Specifically, while Plaintiffs maintain that their claims are meritorious, liability was by no means

20  assured.  Even if Plaintiffs were to establish liability, the certainty of collecting damages or

21  securing meaningful corporate governance measures is far from certain.  The Settlement

22  eliminates these risks and guarantees that Momentus and its stockholders will get the substantial

23  benefits afforded by the Settlement if approved.  Middleton Decl., ¶¶53–54.

24     The Derivative Matters would need to surpass the pleading stage, which is no easy feat

25  considering the challenges of establishing the demand requirements under Delaware law.  *See*

26  Delaware Chancery Court Rules, Rule 23.1.  Plaintiffs that served litigation demands, like

27  Plaintiff here, would specifically need to establish that the Board wrongfully refused the

28  respective demands, a decision generally protected under the business judgement rule.  *Spiegel*

1    *v. Buntrock*, 571 A.2d 767, 774 (Del. 1990).  For Plaintiff Rivlin, pleading demand futility, too,

2    presented its own challenges.  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)

3    (demand futility is satisfied only under "'extraordinary conditions'").  The Derivative Matters

4    also allege violations of the federal securities laws and breaches of fiduciary duties beginning in

5    at least October 2020, and certain claims rest on circumstantial evidence and alleged oversight

6    failures, the most difficult theory in corporation law upon which a plaintiff might hope to win a

7    judgment.  *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

8        Even if Plaintiffs were successful in establishing liability, the issue of damages would

9    have been disputed.  *See, e.g.*, *Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at *5

10   (N.D. Cal. Feb. 15, 2011).  Continued litigation would also likely warrant significant discovery

11   spanning years of corporate events, disclosures, and operational decisions.  Such discovery

12   practice would be costly, expensive and time-consuming for the Settling Parties.  Middleton

13   Decl., ¶56.  Expected and respective motions for summary judgment would have to be briefed

14   and argued, and trials could occupy counsel on all sides for weeks—putting aside potential

15   conflicts and/or confusion that could arise from multi-jurisdiction litigation concerning

16   overlapping facts and events.  Moreover, any judgments favorable to Plaintiffs would likely be

17   the subject of post-trial motions and appeals, potentially prolonging the cases for years with the

18   ultimate outcome uncertain.  Middleton Decl., ¶57.  By contrast, the Settlement provides

19   immediate and substantial benefits to Momentus and its current stockholders and avoids years

20   of delay, added expense, and uncertainty. These considerations support the Settlement's

21   approval.  *See In re Apple Computer, Inc. Deriv. Litig.*, 2008 WL 4820784, at *2 (N.D. Cal.

22   Nov. 5, 2008) ("principal factor to consider . . . is the benefit to [the real party in interest] as

23   compared to the risks posed by derivative litigation").

24        **D.    The Stage Of The Proceedings**

25        The stage of the proceedings and the amount of discovery completed is another factor

26   the Court may consider in determining the fairness, reasonableness, and adequacy of a

27   settlement.  *Officers for Just.*, 688 F.2d at 625.  While the Settlement precedes formal contested

28   discovery and other costly prosecution efforts, thus preserving the Company's resources,

1   Plaintiffs and their counsel acted on an informed basis in negotiating the Settlement. "'[F]oral

2   discovery is not a necessary ticket to the bargaining table' where the parties have sufficient

3   information to make an informed decision about settlement." *See In re Mego Fin. Corp. Sec.*

4   *Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), as amended (June 19, 2000).

5          The Settling Parties reached a stage in the proceedings where an intelligent evaluation

6   of the strengths and weaknesses of the Derivative Matters, including the thoroughness and

7   propriety of the Settlement, could be fairly made.  Indeed, before agreeing to the Settlement,

8   Plaintiffs reviewed and analyzed public filings concerning the Company, press releases,

9   transcripts, investor conference calls, news articles, investigations, allegations in the Securities

10  Class Action, reviewed internal books and records produced by Momentus pursuant to books

11  and records demands, researched applicable law, corporate governance issues, prepared detailed

12  demands and a mediation statement, and engaged in extensive settlement discussions, including

13  at the Mediation, among other things. *See* Stip., §II.  As a result, the Settling Parties were able

14  to effectively settle the Derivative Matters at a stage when they had a firm understanding of

15  pertinent legal and factual issues—and the strengths and weaknesses of those issues.

16          **E.      The Settlement Is The Product Of Arm's**
                    **Length Negotiations Led By Experienced Counsel**

17

18          A settlement enjoys a presumption of fairness if it "is recommended by . . . counsel after

19  arm's-length bargaining." *Villanueva v. Morpho Detection, Inc*, 2015 WL 4760464, at *6 (N.D.

20  Cal. Aug. 12, 2015).  In this instance, Plaintiffs and Momentus, and the counsel for each, have

21  independently considered the Settlement and all agree that it is in the best interest of Momentus

22  and its stockholders. *See* Middleton Decl., ¶49.  The negotiations between Plaintiffs' Counsel

23  and counsel for Defendants included extensive negotiations and numerous revisions to proposed

24  corporate governance terms. *See* Stip., §I.C.

25          The negotiations were conducted by highly qualified counsel that have litigated scores

26  of shareholder derivative actions to successful resolution, and whose lawyers are nationally

27  recognized as leaders in the field of shareholder rights litigation.  Copies of the firm resumes of

28  Plaintiffs' Counsel are attached to the accompanying fee declarations of each firm, which are

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

1    attached to the Middleton Decl., as **Exhibits 4–7**, respectively.

2        Defendants were also represented by well-respected corporate defense firms, including

3    Baker and McKenzie LLP, Bradley Arant Boult Cummings LLP, Kirkland & Ellis LLP, and

4    Winston & Strawn LLP, among others.  This further supports a presumption that the Settlement

5    is fair and reasonable.  *See, e.g., Nat'l Rural Telecoms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523,

6    528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel, who are

7    most closely acquainted with the facts underlying litigation.").  The Settlement was also arrived

8    at with the aid of a well-reputed, neutral mediator.  *See* Stip., §I.C; *D'Amato v. Deutsche Bank*,

9    236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement . . . helps to ensure that the proceedings

10   were free of collusion and undue pressure").  Thus, the Settlement should be finally approved.

11   **IV.   THE SEPARATELY NEGOTIATED AND AGREED-TO
          FEE AND EXPENSE AMOUNT SHOULD BE APPROVED**

12       **A.    The Fee And Expense Amount Is Fair And Reasonable In Light
               Of The Settling Parties' Agreement And The Results Obtained**

13

14       "To be entitled to an award of attorneys' fees and expenses, plaintiffs' counsel need not

15   confer a monetary benefit on the corporation, rather corporate governance reforms and other

16   non-monetary relief are sufficient."  *Cohn*, 375 F. Supp. 2d at 861 (citing *Mills*, 396 U.S. at 396).

17       The Settling Parties all agree that the Reforms provided for under the Settlement "confer

18   substantial benefits upon the Company and its stockholders."  *See* Stip., Exhibit C, §III

19   (ECF No. 34-5).  While difficult to quantify, the therapeutic value of the Reforms and their

20   impact on the Company's intrinsic value are substantial.  *See Maher v. Zapata Corp.*, 714 F.2d

21   436, 461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a

22   substantially greater economic impact on it, both long- and short-term, than the dollar amount

23   of any likely judgment").

24       As discussed above, the Reforms to Momentus's internal controls over financial

25   reporting, risk management, director independence, oversight, and management-level

26   enhancements and new Clawback Policy, among other things, directly address the alleged

27   misconduct in the Derivative Actions, which centered around the Company's disclosures, and

28   operations, while also improving the overall corporate governance policies and practices at

1    Momentus, generally.  These substantial benefits support the requested Fee and Expense

2    Amount, which is moderate relative to fees awarded in derivative settlements that achieved

3    comparable, nonmonetary benefits.  *See* Middleton Decl., ¶66; *see, e.g.*, *Arnaud van der Grach*

4    *de Gomersal v. Auerbach*, 2019 WL 7753447, at \*2, \*4 (C.D. Cal. Jan. 7, 2019) ($1.175 million

5    fee in governance-only settlement involving, among other things, the creation of a new

6    committee to oversee research and development and pre-approve public disclosures).

7         In recognition of Plaintiffs' Counsel's efforts in achieving a Settlement that provides

8    substantial benefits to Momentus and its stockholders, the Settling Parties agreed that Plaintiffs'

9    Counsel are entitled to awards of reasonable attorneys' fees and expenses for their roles in

10   connection with the Settlement, and Defendants do not oppose Plaintiffs' request for an amount

11   up to or including the Fee and Expense Amount of $300,000. Stip., §V, ¶5.1.  Accordingly,

12   here, the Court is not being called upon to fashion a fee and expense award; rather, it is being

13   asked to determine whether the Fee and Expense Amount agreed to by well-represented parties

14   at arm's-length and endorsed by the Mediator and approved by the independent Board members

15   in an exercise of its business judgment, falls within the range of reasonableness.  The Supreme

16   Court has endorsed this type of consensual resolution of attorneys' fees issues as the ideal toward

17   which litigants should strive.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for

18   attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will

19   settle the amount of a fee.").  Indeed, in the settlement of a derivative action, a court in this

20   District noted that "a negotiated fee agreement . . . is not subjected to the same level of judicial

21   scrutiny as a disputed fee request."  *Feuer v. Thompson*, 2013 WL 2950667, at \*4 (N.D. Cal.

22   June 14, 2013).[8]  The Settling Parties' arm's length negotiation, under the supervision of a

23   mediator, of a fair and reasonable Fee and Expense Amount is entitled to substantial deference.

24        Furthermore, it was only after the Settling Parties reached an agreement in principle on

25   the substantive consideration for the Settlement that they began negotiating what they believed

26

27   [8] Here, Momentus and its insurers were represented by counsel and had every incentive to pay

28   the lowest possible Fee and Expense Amount.  *See* Middleton Decl., ¶¶61–62.

1    to be fair and reasonable compensation for Plaintiffs' Counsel.  These negotiations, which

2    resulted in an agreed upon amount of $300,000, were facilitated by Mr. Melnick.  Melnick Decl.,

3    ¶10.  *Satchell*, 2007 WL 1114010, at *4 ("[t]he assistance of an experienced mediator in the

4    settlement process confirms that the settlement is non-collusive.")

5

6           **B.      A Lodestar Cross-Check Supports**
                      **Approval Of The Fee and Expense Amount**

7           Finally, a lodestar cross-check further confirms the reasonableness of the Fee and

8    Expense Amount.  *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 445 F. Supp. 3d 508, 519

9    (N.D. Cal. 2020), aff'd, 845 F. App'x 563 (9th Cir. 2021).  In prosecuting Momentus's claims

10   to fruition, Plaintiffs' Counsel incurred time and expenses of 1,600.25 hours and $27,759.63,

11   respectively, resulting in a negative multiplier of 0.26 (based on $300,000.00 attorneys' fee

12   divided by $1,143,730.75 lodestar) which is fair and reasonable.  Middleton Decl., ¶69; *See,*

13   *e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051–54 (9th Cir. 2002) (citing 23 shareholder

14   settlements and multipliers for each, for which the average multiplier was 3.28).   Courts

15   routinely approve agreed-to fees in derivative litigation involving corporate governance

16   enhancements like the Reforms secured here, which further evidences the reasonableness of the

17   agreed-to fee.  *See, e.g., Sun v. Grapelli*, No. 3:21-cv-00311 (M.D. Tenn. July 16, 2024) ($2.5

18   million fee for corporate therapeutics) (Middleton Decl., **Exhibit 2**); *In re Zuora, Inc. Deriv.*

19   *Litig.*, No. 3:19-cv-05701-SI (N.D. Cal. Sept. 18, 2023) (approving $2.0 million fee for

20   corporate governance reforms) (Middleton Decl., **Exhibit 3**).

21           **C.      The Service Awards Should Be Approved**

22          The Stipulation further provides that Plaintiffs may apply for Service Awards in the

23   amount of $2,000, each, to be paid to Plaintiffs exclusively from the Fee and Expense Amount.

24   Stip., §V, ¶5.9.  Plaintiff submits that the modest Service Awards should also be approved.  *See*

25   Middleton Decl., ¶71; *Mego Fin. Corp.*, 213 F.3d at 463; *In re Cendant Corp., Deriv. Action*

26   *Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (service awards "reward the public service

27   performed by lead plaintiffs"); *Sauby v. City of Fargo*, 2009 WL 2168942, at *1 (D.N.D.

28   July 16, 2009) (upholding incentive amounts of $5,000 and $10,000 because, among other

1    things, "[i]incentive awards are not intended to 'compensate' plaintiffs, but instead serve to

2    encourage people with legitimate claims to pursue the action").

3    **V.**        <u>**CONCLUSION**</u>

4            For the foregoing reasons, Plaintiff respectfully requests that this Court grant the Motion

5    in its entirety.

6    Dated: October 17, 2024                         **JOHNSON FISTEL, LLP**

7                                                     */s/ Brett M. Middleton*
                                                     BRETT M. MIDDLETON

8                                                     FRANK J. JOHNSON

9                                                     JONATHAN M. SCOTT
                                                     501 West Broadway, Suite 800

10                                                    San Diego, CA 92101
                                                     Telephone: (619) 230-0063

11                                                    brettm@johnsonfistel.com
                                                     frankj@johnsonfistel.com

12                                                    jonathans@johnsonfistel.com

13                                                    *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on October 17, 2024, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   e-mail addresses on the Electronic Mail Notice for this action.

5

                                                                */s/ Brett M. Middleton*

6                                                      BRETT M. MIDDLETON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT; Case No. 5:23-CV-00374